**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------X
OSAMA HAZZA SALEH,

            Plaintiff,

     -against-

PRETTY GIRL, INC., HIGH STYLES, INC.,
JAMES ROBINSON, in his individual
and official capacity, and ALBERT
HAMRA, in his individual and official
capacity,

           Defendants.
-----------------------------------X

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ SEP 2 8 2012 ★

BROOKLYN OFFICE

**MEMORANDUM AND ORDER**

Civil Action No.
09-CV-1769 (ENV)(RER)

**VITALIANO, D.J.:**

     Plaintiff Osama Hazza Saleh brings this action against defendants Pretty Girl, Inc.

("Pretty Girl"), High Styles, Inc. ("High Styles"), James Robinson, and Albert Hamra. Plaintiff

alleges that Robinson, a co-worker, harassed him because of his national origin and religion.

This harassment culminated in a September 5, 2007 incident in which Robinson punched Saleh

in the face. Plaintiff claims that defendants violated 42 U.S.C. § 1981, Title VII of the Civil

Rights Act of 1964, 42 U.S.C § 2000(e) et seq., and New York Executive Law § 296

("NYSHRL"). Pl.'s Second Am. Compl. ("SAC"), ECF No. 37. Plaintiff also brings claims for

battery, assault, negligence, intentional infliction of emotional distress, negligent infliction of

emotional distress, vicarious liability, and breach of contract. SAC.

1

Pretty Girl has moved for summary judgment with respect to all claims asserted against it. It contends that summary judgment is warranted because, although Pretty Girl, Inc., and High Styles share common ownership and management, plaintiff and Robinson were employed by High Styles exclusively, and that there is no basis to pierce its corporate veil to hold Pretty Girl accountable for the actions of a separate corporation's employees. Pretty Girl also maintains that it cannot be liable for any acts of harassment because it, in any case, was not aware of the harassment prior to the September 5, 2007, assault and, more significantly, High Styles's pre-assault response to Saleh's complaints about the co-worker, and Pretty Girl's own response to the assault, were both reasonable.

For the reasons set forth below, defendant's motion is denied.

## BACKGROUND

### A. Saleh's Employment

High Styles owns and operates a single retail clothing store at 441 Knickerbocker Avenue, Brooklyn, New York ("Knickerbocker Store"). Def.'s 56.1 Statement ("Def.'s 56.1") ¶¶ 3, 4, 5; Decl. of Albert Nigri ("Nigri Decl.") ¶ 7, ECF No. 48-9 . The Knickerbocker Store sells "Pretty Girl" garments, Nigri Decl. ¶ 7, and does business as "Pretty Girl." Google Maps Photograph of Knickerbocker Store, Decl. of G. William Germano ("Germano Decl."), Ex. B, ECF Nos. 49, 51. The Knickerbocker Store is part of a chain of 36 similar "Pretty Girl" stores in the New York and New Jersey area.[1] Pretty Girl Handbook of Rules, Regulations, and Policies

---

[1] The relationship among the High Styles, Pretty Girl, Inc., and the other "Pretty Girl" stores is discussed further infra.

("Pretty Girl Handbook"), Germano Decl., Ex. C. At the time of the incidents in question, the Knickerbocker Store had 10 to 15 employees. Dep. of Albert Hamra ("Hamra Dep.") 24, Germano Decl., Ex. R.

Saleh and Robinson both worked at the Knickerbocker Store. Dep. of Osama Saleh ("Saleh Dep") 16, Germano Decl., Ex. T. Saleh was employed as a stock clerk and Robinson worked as a security guard. Hamra Dep. 54, 65.

Saleh, who was born in Yemen and came to the United States in 2006, is Muslim. Saleh Dep. 17-19. Once a day, he would pray in the basement of the store. Hamra Dep. 136.

Plaintiff maintains that Robinson repeatedly called him "bin Laden" and also told him that "Muslims are dirty and terrors [sic]." Saleh Dep. 59, 82; see also id. at 44 (testimony, discussed further infra, indicating that Saleh complained to a supervisor that Robinson had cursed his religion and said that "Muslims are dirty and terrorists.").[2]

Hamra, who was Saleh and Robinson's manager, admits that he heard Robinson call Saleh "bin Laden" a "few times." Hamra Dep. 83. Saleh, however, asserts that this occurred "many times." Saleh Dep. 59.

According to Hamra, these statements would occur in the context of Saleh and Robinson "kidding around" and "teasing each other." Hamra Dep. 84. Saleh maintains, to the contrary, that Robinson "never joked" with him and was always "serious and mean." Saleh Dep.

---

[2] In outlining Robinson's comments to Saleh, plaintiff's 56.1 Statement cites to plaintiff's interrogatory response, in which plaintiff asserted that Robinson directed other statements at him including: (1) "Go back to your country"; (2) "I hate Arabs"; (3) "Dirty Arab"; and (4) "Muslim Terrorist." Pl.'s Responses to Defs.' Interrogs., Germ. Dec. Ex. F. at 9-10. None of these statements are discussed in Saleh's deposition and Saleh has not provided any affidavit addressing these statements. Defendant, however, has not objected to plaintiff's use of his interrogatory response to establish these facts.

57. According to Hamra, when Robinson would call Saleh "bin Laden" and no one else was around, Saleh would simply say "things" back to Robinson, such as telling him that he acts "like a little kid and that he should act like a grownup." Hamra Dep. 84, 100-01.

A "few times," Hamra concedes, Saleh told him that he did not like being called "bin Laden." Id. at 89. According to Hamra, Saleh told him that he was embarrassed and did not like it when Robinson called him "bin Laden" in front of customers or other employees. Id. at 156, 185-86; see also id. at 84-85 (admission by Hamra that Saleh would get "a little bit embarrassed" when these comments were made with other people around). Notably, Saleh's complaints to Hamra only concerned the "bin Laden" comments. Id. at 96. Saleh, Hamra says, never complained to him about other offensive comments or any intimidation by Robinson. Id. at 96, 99.

When Hamra would hear Robinson calling Saleh "bin Laden," he would tell Robinson not to refer to Saleh in that way. Id. at 85-86, 186. Hamra would also speak with both Robinson and Saleh when this abuse occurred. Id. at 83-84. When Hamra spoke to Robinson, Robinson did not "take it that seriously," telling Hamra that Saleh had called him a "nigger," and indicating that they were joking around. Id. at 189. According to Hamra, after he told Robinson to stop calling Saleh "bin Laden," he did not hear Robinson say it again. Id. at 86, 189. Hamra maintains that he told both Robinson and Saleh that "whoever is not going to follow [his instructions] is going to get fired."[3] Id. at 189.

---

[3]  In its 56.1 Statement, Pretty Girl, Inc. maintains that Hamra "reprimanded" Robinson for comments to Saleh. Def.'s 56.1 ¶ 14 (citing Saleh Dep. 44-45). However, in the cited testimony, Saleh simply states that "[Hamra] spoke to [Robinson], but he didn't do anything to him." Saleh Dep. 44.

Importantly, there is a factual dispute related to Hamra's testimony that Robinson stopped calling Saleh "bin Laden" after Hamra spoke with him. As discussed more fully infra, according to Saleh, on the very day that he was assaulted, he had complained to Hamra, prior to the assault, that Robinson had again called him "bin Laden." In addition, Hamra's own testimony is somewhat inconsistent concerning his response to Saleh's complaints and Robinson's subsequent conduct. Although Hamra testified that Robinson ceased calling Saleh "bin Laden" after Hamra's rebuke of him, other portions of Hamra's testimony suggest that he told Robinson to stop on multiple occasions. That testimony suggests, inter alia, that, even prior to Robinson's comments on the day of the assault, Robinson may have continued to make comments after Hamra spoke with him.

It is undisputed, though, that Robinson never received any written warning or other discipline regarding his "bin Laden" statements. Id. at 86. In addition, Hamra never informed his superior, Victor Lavy, of Saleh's complaints, id. at 156; Dep. of Victor Lavy ("Lavy Dep.") 74, 126, Germano Decl., Ex. S, and he never told Saleh that Saleh should report his complaint to Lavy, Hamra Dep. 155. As explained infra, Lavy, the supervisor/vice president of operations for all the Pretty Girl stores in New York, Lavy Dep. 32, 67, was tasked with receiving and addressing all harassment complaints related to all of the Pretty Girl Stores.

Besides complaining to Hamra, Saleh also complained to two other employees of the Pretty Girl chain prior to the September 5, 2007 assault. Saleh spoke with Ali Jackson, who Saleh refers to as the "second supervisor." Saleh Dep. 44. Saleh told Jackson that Robinson was hurting him, cursing his religion, calling him "bin Laden," and saying that Muslims are dirty and terrorists. Id.; see also id. (suggesting that Saleh also told Jackson "[m]any [other unidentified]

things" that Robinson said). Jackson took no action after Saleh complained to him. Id. The record does not indicate when this complaint was made or which Pretty Girl store Jackson supervised. Additionally, Saleh telephoned an unidentified employee, who apparently worked at Pretty Girl, Inc.'s headquarters. Id. at 44-56. The record does not indicate the substance of Saleh's conversation with, nor the responsibilities of, this unidentified employee. See id. at 44-45. The employee at the "company" responded, "I'll see," and, plaintiff says, took no further action. Id.

On September 5, 2007, Saleh claims he was working at the Knickerbocker Store when Robinson again called Saleh "bin Laden" and told Saleh to cover his security post while he went to the bathroom. Id. at 70. Saleh went to Hamra and told him that "[Robinson's] calling me bin Laden, I'm not going to switch with him," and that Hamra had "to stop this problem." Id. at 70, 73. After instructing Saleh to do some work in the basement, Hamra spoke to Robinson. Id. at 73. The record, however, does not indicate what was said during this conversation. See id..; Hamra Dep. 105 (stating that Hamra did not recall any conflict between Saleh and Robinson prior to Robinson's assault).

A short while later, according to plaintiff, Robinson confronted Saleh in the basement of the store. Robinson told Saleh, "I'm going to call the police on you, telling them that you don't have papers and you are a terror [sic]." Saleh Dep. 89. Saleh responded that Robinson "cannot do anything" because he had " papers." Id. Robinson then told Saleh, "You're not an American," to which Saleh responded, "My father is an American, so I'm an American." Id. Robinson then called Saleh "an Arabic, terror [sic]," pushed him and then punched him in the face, knocking

him to the floor. Id. at 89-93. After Saleh informed Hamra of the assault, Hamra sent Robinson home. Id. at 95.

As a result of the assault, Saleh suffered a fractured zygomatic arch and was hospitalized for approximately one week. Id. at 93-94, 98, 108, 113; Sept. 6, 2007 Radiology Report, Germ. Dec. I. Saleh never returned to work at the Knickerbocker Store. Hamra Dep. 129. Robinson eventually pled guilty to assault in the third degree. Certificate of Disposition Indictment for Robinson, Germ. Dec. Ex. H.

After Robinson's assault, Hamra spoke to Lavy about the incident and, at Lavy's direction, sent a written incident report to Pretty Girl's central office. Hamra Dep. 68, 83-84, 117, 122, 124. On the day of the assault, Lavy instructed Hamra to terminate Robinson. Lavy Dep. 89. It is unclear if Hamra ever communicated this to Robinson. See Hamra Dep. 128; Lavy Dep. 46. But, a few days after the assault, Robinson went to a Pretty Girl store located on Graham Avenue in Brooklyn ("Graham Ave. Store") looking for work and was given a job. Lavy Dep. 90-91. Within a week's time or so, Lavy learned that Robinson was working at the Graham Avenue Store. Id. at 93. Lavy then terminated Robinson and noted in his electronic personnel file that he was not allowed to work "in the company." Id.; Quickbook Information Screen, Germ. Dec. Ex. J.

## B. Relationship between Pretty Girl and High Styles

### 1. Overview

Pretty Girl is a corporation that purchases and sells wholesale clothing. Nigri Decl. ¶ 5. Most of Pretty Girl's sales are to 37 "Pretty Girl" retail stores located in the tri-state area, including the Knickerbocker Store owned by High Styles. Id. ¶¶ 7, 9-10; Pretty Girl Handbook.

7

The "Pretty Girl" retail stores are all established as separate corporations, but do business under the name "Pretty Girl," have common shareholders and all the corporate entities share some executive officers, and directors.[4] Nigri Dec. ¶¶ 16-19, Lavy. Dep. 19. Essentially, the same individuals who manage High Styles manage Pretty Girl. Lavy Dep. 19. The two companies, however, maintain separate bank accounts and do not commingle funds. Nigri Decl. ¶¶ 16-18.

## 2. Employment Status of Robinson, Saleh, and Hamra

The employees who work at the Knickerbocker store, including Saleh, Robinson, and Hamra, were paid by High Styles from its own bank account. Id. ¶ 18. Lavy and Albert Nigri, who is the president of Pretty Girl, and a shareholder of High Styles, maintain that Saleh and Robinson were employees of High Styles, not Pretty Girl. Nigri Decl. ¶¶ 4, 18; Lavy Dep. 29-30. The evidentiary package is not so neat.

Pretty Girl has made conflicting statements in sworn interrogatory responses about the employment status of the workers at the Knickerbocker Store. In one interrogatory response, defendant stated that "Robinson was an employee of Pretty Girl," which the response defined as Pretty Girl, Inc. Pretty Girl, Inc., and Albert Nigri's Nov. 11, 2009 Responses to Pl.'s Requests for Interrogs. at 1, 4-5, Germano Decl., Ex. Q. Also, in a different interrogatory response, defendant stated that Robinson and other employees who were working at the Knickerbocker

---

[4] Although most of the evidence in the record only explicitly discusses the relationship between Pretty Girl and High Styles (owner of the Knickerbocker Store), see Nigri Dec. ¶¶ 16-19, Lavy. Dep. 19, the other 36 "Pretty Girl" retail stores are presumably also set up as separate, but commonly controlled, corporations. See Lavy Dep. 34 (referring to Pretty Girl store on Roosevelt Avenue in Queens as "Pretty Girl of Roosevelt," suggesting that it is a distinct corporate entity); cf. Lavy Dep. 91 (stating that the Graham Ave. Store was under Pretty Girl, Inc.'s "control and direction and supervision" and that it was not "independently owned by someone other than Pretty Girl, Inc.").

Store on the day that Saleh was assaulted "were employed by and/or agents of Pretty Girl, Inc." Pretty Girl, Inc., and Albert Nigri's Supplemental Apr. 19, 2010 Response to Pl.'s Interrog. Number 15 and Responses to Pl.'s Supplemental Interrogs., at 2-3, Germano Decl., Ex. Q. Although this interrogatory response lists Robinson and a number of other employees (including a "John Doe") as working at the Knickerbocker Store on September 5, 2007, this response does not explicitly include Saleh or Hamra among those employees. Nonetheless, a jury could reasonably infer, from this response, that defendants' admission that the other employees were "employed by and/or agents of Pretty Girl, Inc." extends to Saleh and Hamra.[5]

### 3. Management of the Knickerbocker Store and the Other Pretty Girl Stores

When Hamra was hired in the beginning of 2007, he initially managed a different Pretty Girl store and, since his hiring, has worked as a manager at 12 different Pretty Girl stores. Hamra Dep. 22-23, 28-29, 39-40. Once Hamra was transferred to the Knickerbocker Store, he was paid from High Styles's bank account.[6] Nigri Dec. ¶ 18. Hamra and Saleh had both worked at the Graham Ave. Store before being transferred together to the Knickerbocker Store. Hamra Dep. 49.

As a manager, Hamra handled the hiring at each of the stores that he managed, including the Knickerbocker Store. Id. at 45, 48. However, after Hamra would hire employees, they would

---

[5] In responding to this interrogatory, defendant relied on the Knickerbocker Store's time clock records. It seems likely that Saleh is the "John Doe" mentioned in the response. Hamra may have been excluded from this response because he was the manager and may not have used the time clock.

[6] It should be noted that the 196-page transcript of Hamra's deposition does not contain a single reference to High Styles. At his deposition, Hamra used the term "Pretty Girl" to refer to the Knickerbocker store, the other stores and the overarching operation. See, e.g., Hamra Dep. 22-25, 28-29, 38-40.

first have to report to Pretty Girl's central office before starting work. Id. at 61. As a manager, Hamra was in charge of the employee's work schedules, id. at 146, and also had the ability to fire employees whom he managed, id. at 48. Whenever Hamra would fire someone, he would inform Lavy. Id. at 174-75.

Lavy, as the supervisor/vice president of operations of all the Pretty Girl stores in New York, supervised the management of the Knickerbocker Store and the other Pretty Girl retail locations. Although High Styles and Pretty Girl have essentially the same officers and the same management team, Lavy Dep. 19, the record does not indicate what specific position Lavy held (if any) at High Styles and the other Pretty Girl retail stores. Nonetheless, Lavy regularly traveled to the various stores he supervised, including the Knickerbocker Store, which he visited "maybe once a week more or less" to "check the store, merchandise, the basement, the workers, and the manager." Lavy Dep. 22-23; see also id. at 11-12, 21-23, 32, 67. Lavy, however, never gave any instructions to Saleh. Id. at 31.

Lavy, moreover, was responsible for hiring and firing the managers who ran each of the individual Pretty Girl stores. Lavy Dep. 34-35. He also had the ability to fire employees at Pretty Girl stores. As noted earlier, it was he who instructed Hamra to terminate Robinson on the day of the assault and who then again ordered Robinson terminated after he was hired by the Graham Ave. Store. (Also, if employees wanted to transfer between stores, Lavy would make that decision.[7] Id. at 47, 49.)

_____

[7] Employees would sometimes be assigned from their regular Pretty Girl store to a different store for a "a couple days" in order to fill staffing shortages. Hamra Dep. 51-53. The record does not indicate which entity would pay the employees during these assignments.

### 4. Personnel Policies at Pretty Girl Stores

All employees at the 37 Pretty Girl retail stores, including the Knickerbocker store, were governed by the same Pretty Girl Handbook.[8] The handbook includes centralized policies concerning store hours and standards of employee conduct. Pretty Girl Handbook at 2-3. A number of policies indicate Lavy's close involvement in the operation of the retail stores. Lavy had the right to transfer employees from one store to another. Id. at 7. The handbook also states that Lavy handled discipline for the Pretty Girl stores and was responsible for issuing verbal and written warnings to employees, and for terminating employees. Id. at 5.

Of particular relevance to the instant suit is the handbook's harassment policy, which provides that any employees who believe that they have been harassed or discriminated against should contact Lavy, "P.G.'s vice president in charge of operations." Id. at 1-2. Then, if the complaining employee was not satisfied with Lavy's response, the employee had a right to appeal to the president of Pretty Girl. Id.

Importantly, company policy also imposed a duty on mangers, such as Hamra, to report any complaints of discrimination or harassment to Lavy. Hamra Dep. 154-155; Lavy Dep. 70-71, 76, 126. Lavy was supposed to handle all discipline related to harassment complaints; managers were not allowed to take "any action" against employees that were accused of harassment, Lavy Dep. 98.

The personnel functions of the Pretty Girl chain are also centralized in other ways. Personnel files for employees of all of the Pretty Girl stores were stored at Pretty Girl's

---

[8] Saleh testified that he was not aware of the handbook, Saleh Dep. 30, 77, and there is no evidence in the record that he ever received a copy of the handbook.

headquarters. See Lavy Dep. 37-38 (stating that such documents for all "Pretty Girl" employees are maintained at headquarters and no indication that the filing was limited to individuals employed by Pretty Girl, Inc.); see also id. at 94, 97-98, 107 (pages of deposition testimony discussing electronic personnel files at Pretty Girl headquarters). All Pretty Girl stores also appear to use the same employment application, which simply states "Pretty Girl" at the top of the form. See Employment Application of Robinson, Germano Decl., Ex. D.

## C. Procedural History

Plaintiff's original complaint did not name High Styles or Hamra as defendants. Compl., ECF No. 1. High Styles was not named as a defendant until plaintiff filed his SAC on August 2, 2010. The original complaint named Albert Nigri as a defendant and erroneously identified him as the manager of the Knickerbocker Store. Id. ¶ 18. In April 2010, Pretty Girl and Nigri filed a pre-motion conference letter in order to seek summary judgment on the claims against Nigri. Apr. 21, 2010, Ltr., ECF No. 19. This letter states that both Saleh and Robinson were employees of Pretty Girl, Inc. Id. The parties subsequently stipulated to an amended complaint substituting Hamra for Nigri. May 19, 2010, Ltr., ECF No. 24.

As discussed above, in interrogatory responses dated November 11, 2009 and April 19, 2010, Pretty Girl indicated that Robinson and other employees at the Knickerbocker Store were employees and/or agents of Pretty Girl, Inc. Furthermore, prior to High Styles being named as a defendant, Pretty Girl responded to an interrogatory request that sought the names of all employees who were hired by "Pretty Girl, located . . . at Knickerbocker Avenue . . . from 2000 through the present," by providing the names and employment dates of all employees of the

Knickerbocker Store during the subject time period. Pretty Girl, Inc., and Nigri's Supplemental Response to Pl.'s Interrogs. dated March 8, 2012, Germano Decl., Ex. N.

In July 2010, after Lavy was deposed, Pretty Girl and Hamra filed another pre-motion conference letter. July 16, 2010, Ltr., ECF No. 34. In the letter, defendants argued, inter alia, that Pretty Girl was entitled to summary judgment because High Styles, and not Pretty Girl, was plaintiff's employer. Id. Plaintiff filed a response letter arguing that High Styles is the "alter ego" of Pretty Girl, Inc. July 23, 2010, Ltr. at 3 (citing Goodman Piping Prods. v. N.L.R.B., 741 F.2d 10 (2d Cir. 1984)), ECF No. 35. Plaintiff also asked, in the alternative, for permission to add High Styles as a defendant. Id. That request was granted, and, on August 2, 2010, plaintiff filed his SAC, which alleges that Saleh, Robinson, and Hamra were employees of Pretty Girl, Inc., "and/or" High Styles. SAC ¶¶ 14-15, 37. In September 2010, Pretty Girl, Inc., served its motion for summary judgment, arguing that: (1) plaintiff was employed by High Styles and, therefore, only High Styles could be liable; (2) Pretty Girl, Inc., was not aware of the harassment prior the September 5, 2007, assault; and (3) the responses of Hamra and Lavy to plaintiff's complaints and the assault itself were reasonable. It does not appear that any additional discovery was conducted after the SAC was filed.

## DISCUSSION

### A. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried. In determining whether summary judgment is appropriate, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotations and citations omitted). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy–Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

If the moving party satisfies this burden, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Importantly, if the evidence produced by the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986) (internal citations omitted).

## B. Veil-Piercing, Agency, and Single Employer

Defendant argues that it should be dismissed from this action because High Styles, and not Pretty Girl, Inc., was plaintiff's employer and there is no basis in the record for piercing the corporate veil. Plaintiff counters that, under traditional agency principles, High Styles was Pretty Girl's agent. According to plaintiff, Pretty Girl would also be liable under a veil-piercing analysis.

The true issue, of course, is not whether there is support for piercing the corporate veil

14

but whether, on the facts alleged, there is *any* plausible theory of liability on Pretty Girl's part about which there is a material issue of fact in dispute. In fact, as explained below, it is unnecessary to rely on either a veil-piercing or agency theory to decide the instant motion because Pretty Girl has admitted in interrogatory responses and in a pre-motion conference letter of its counsel that it employed the workers at the Knickerbocker Store. Moreover, although not raised by plaintiff, there is sufficient evidence in the record for a jury to conclude that Pretty Girl, Inc., and High Styles are jointly liable for violations of the state and federal anti-discrimination laws at issue because the two entities constitute a single employer.

## 1. Veil Piercing

Under New York law, "[g]enerally, a plaintiff seeking to pierce the corporate veil must show that complete domination was exercised over a corporation with respect to the transaction[s] attacked, and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Fernbach, LLC v. Calleo, 92 A.D.3d 831, 831 (N.Y. 2d Dep't 2012) (quoting Morris v. New York State Dep't. of Taxation & Fin., 82 N.Y.2d 135, 141 (1993)). Even absent fraud, "the corporate veil will be pierced to achieve equity . . . [w]hen a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego." Id. (quoting Island Seafood Co. v Golub Corp., 303 A.D. 2d 892, 893 (N.Y. 3d Dep't 2003) (internal marks omitted). In analyzing a veil-piercing claim, relevant factors to consider include:

> (1) the absence of the formalities and paraphernalia that are part
> and parcel of the corporate existence, i.e., issuance of stock,
> election of directors, keeping of corporate records and the like,

15

(2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991).

### 2. Agency

Under New York law,

An agency relationship exists . . . when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent. The element of control often is deemed the essential characteristic of the principal-agent relationship. To bind a principal, an agent must have authority . . . . Actual authority arises from a principal's direct manifestations to the agent. It may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act.

In re Parmalat Secs. Litig., 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) (internal marks and footnoted citations omitted).[9] It is not clear how, if at all, the standard for establishing an agency

---

[9] In support of its agency argument, plaintiff cites to Cleveland v. Caplaw Enterps., 448 F.3d 518 (2d Cir. 2006), which sets out the federal law standard for establishing an agency relationship. According to Cleveland, an agency relationship requires "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." Id. (citations and internal marks omitted). Although Cleveland involved a claim under the federal

16

relationship based on one corporate entity's domination of another differs from the test for veil-piercing. See Fidenas AG v. Honeywell Inc., 501 F. Supp. 1029, 1037 (S.D.N.Y. 1980) ("The tests for finding agency so as to hold a parent corporation liable for the obligations of its subsidiary . . . are virtually the same as those for piercing the corporate veil."); cf. Island Seafood, 303 A.D.2d at 893-94 (explaining that, in determining whether to pierce the corporate veil, courts consider "such factors as whether there is an overlap in ownership, officers, directors and personnel, inadequate capitalization, a commingling of assets, or an absence of separate paraphernalia that are part of the corporate form, such that one of the corporations is a mere instrumentality, agent and alter ego of the other") (emphasis added and citation omitted).

### 3. Single Employer

In Title VII cases, courts have recognized the single employer and joint employer doctrines as "exceptions to the rule that employment discrimination actions may be maintained only against a plaintiff's direct employer." Goodman v. Port Auth. of New York and New Jersey, No. 10 Civ. 8352, 2012 WL 664531, at *16 (S.D.N.Y. Feb. 29, 2012). Where two entities are deemed to be a single employer, both entities are "subject to joint liability for employment-related acts." Murray v. Miner, 74 F. 3d 402, 404 (2d Cir. 1996); see also Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir. 1995) (denying summary judgment against parent where plaintiff worked for wholly-owned subsidiary). "Single integrated

---

Fair Housing Act, the same standard would apply to Saleh's federal claims. See Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 996 (6th Cir. 1997) (looking to common law of agency in employment discrimination suit, and denying plaintiff's claim where university did not delegate to bookstore operator "authority to make employment decisions on its behalf, nor did it exercise the requisite control over [operator's] employment decisions"). In any event, it is not clear that there are any relevant differences in the agency standards under federal and New York law.

enterprises can include parent and wholly-owned subsidiary corporations or separate corporations that operate under common ownership and management."[10] Lima v. Addeco, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009), aff'd, 375 F. App'x 54 (2d Cir. 2010).

In order to determine whether a single employer exists, the Second Circuit has adopted a "flexible four-part test," which looks to: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. Cook, 69 F.3d at 124. "[C]ontrol of labor relations is the central concern." Murray, 74 F. 3d at 404-05. Although the Second Circuit has noted that the "critical question" is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?," Cook, 69 F.3d at 1240 (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir.1983)), "no one factor is determinative," Murray, 74 F.3d at 404; see also Levine v. Reader's Digest Ass'n, Inc., 347 F. App'x 602, 604-05 (2d Cir. 2009) (upholding jury instruction that cited "critical question" language quoted above, but "did not encourage the jury to place undue weight on any one factor, such as what entity made the final termination decision"). Whether related entities qualify as a single employer is an issue of fact. Salemi v. Boccador, Inc., No. 02 Civ. 06648, 2004 WL 943869, at *4 (S.D.N.Y. Apr. 29, 2004).

---

[10] "[T]he 'joint employer' doctrine applies when separate legal entities have 'chosen to handle certain aspects of their employer-employee relationships jointly.'" Lima v. Addeco, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) (quoting Gore v. The RBA Group, Inc., No. 03-CV-9442, 2008 WL 857530, at *3 (S.D.N.Y. Mar. 31, 2008)). "The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities[;] . . contractors and subcontractors[;] and other scenarios where two separate entities have control over an employee's employment." Id. at 400. Given the common ownership and management of High Styles and Pretty Girl, Inc., if liability were to attach to Pretty Girl, Inc., it would be as a single, rather than joint, employer.

The single employer doctrine has also been applied to suits brought under the NYSHRL. See Argyle Realty Assocs. v. New York State Div. of Human Rights, 65 A.D.3d 273 (N.Y. 2d Dep't 2009) (using single employer test to aggregate employees of multiple entities to meet NYSHRL's four-employee threshold). It is not clear if the single employer doctrine would extend to New York common law claims. Cf. Murray, 74 F.3d at 404-05 (concluding that the New York Court of Appeals would look to federal single employer precedent for common law claims, but ultimately finding that plaintiff's allegations failed to establish single employer). It is hard to fathom, to say the least, though, how an entity held accountable as an "employer" under federal and state employment discrimination laws could escape liability for other torts inextricably hinged to the very same employment relationship.

**4. Analysis**

Although the parties raise a number of arguments concerning veil-piercing, agency, and the intersection of those two theories of liability, it is unnecessary to resolve those disputes to decide the instant motion for summary judgment.[11] There is a more fundamental basis for decision.

As a threshold matter, plaintiff would only have to rely on veil-piercing and agency theories if, as defendant contends, Pretty Girl is not the "employer" of Saleh, Robinson and Hamra. However, irrespective of the other evidence in the record, which is plentiful, defendant's

---

[11] In addition to its substantive arguments regarding these two theories, defendant also argues that plaintiff cannot rely on an agency argument because plaintiff did not plead agency in its complaint, which simply alleged that Saleh, Robinson, and Hamra were employees of Pretty Girl "and/or" High Styles. Defendant, however, has not suggested that it was prejudiced by this omission, and all of the potential theories that could render Pretty Girl liable appear to turn on the same universe of evidence. If technical amendment of the operative complaint is needed, leave to do so will be freely granted.

interrogatory responses alone are sufficient to raise a factual issue on the question of whether defendant was their employer. Even though there is evidence in the record that High Styles, and not Pretty Girl, paid the salaries of the relevant employees from its own bank account, Pretty Girl admitted in its interrogatory responses that it employed Robinson and that the workers at the Knickerbocker store were "employees and/or agents" of Pretty Girl. That is sufficient to warrant denial of summary judgment on this issue.

The Court again acknowledges that plaintiff did not raise this specific argument. Instead, yet certainly relatedly, plaintiff relied on defendant's admission that it was Robinson's employer to support its theory that High Styles was Pretty Girl's agent.[12] In any event, even without guidance, the path is clear: the Court finds that Pretty Girl's interrogatory responses, standing alone, are sufficient to raise a factual question as to whether Pretty Girl was the employer of the relevant employees. Notably, despite the fact that plaintiff's agency argument explicitly relies on defendant's admission that it was Robinson's employer, defendant never makes any effort to rationalize that interrogatory response.

Furthermore, although plaintiff does not argue that defendant is liable under the single employer doctrine, which is likely applicable to plaintiff's statutory discrimination claims, the Court is compelled to point out that, based on the instant record, a jury could surely find Pretty Girl liable (if anyone is liable) under that doctrine.

---

[12] Perhaps oddly, plaintiff did not explicitly rely on the other interrogatory response in which defendant admits that Robinson and other workers at the Knickerbocker Store were "employees and/or agents of Pretty Girl, Inc." However, even if this latter response were not considered, the former response that explicitly addressed only Robinson is still sufficient to warrant denial of summary judgment. Given that plaintiff and Robinson were clearly co-workers, defendant's admission that it employed Robinson could also lead a jury to conclude that defendant was also plaintiff's employer.

With obvious significance, in <u>Salemi v. Boccador</u>, the court, confronted with similar circumstances, concluded that a parent and subsidiary constituted a single employer and could, therefore, be aggregated to meet Title VII's 15-employee threshold. 2004 WL 943869, at *4. In <u>Salemi</u>, the plaintiff, a salesperson in a retail store, was harassed by a co-worker, who was later promoted to store manager. <u>Id.</u> at *2. Before the alleged harasser was promoted, the plaintiff had complained to the prior manager. <u>Id.</u> After the alleged harasser's promotion, the harassment intensified and became more explicitly tied to the plaintiff's employment, apparently through requests for sexual acts in exchange for pay raises. <u>Id.</u> The retail store where the plaintiff worked was incorporated as a separate entity and had a relationship with its parent company that was quite similar to the relationship between High Styles and defendant. <u>See id.</u> at *1-2, 5-6. Notwithstanding the fact that the decision in <u>Salemi</u> does not explicitly discuss whether the parent company was aware of the plaintiff's complaints to the prior manager, nothing in the decision suggests that the parent company possessed any knowledge of the harassment (other than any knowledge that might be imputed to it from the subsidiary store managers' knowledge of plaintiff's harassment complaints). Ultimately, the court in <u>Salemi</u> denied summary judgment, reasoning that, because the plaintiff was bringing a harassment claim, "the relevant employment decisions for purposes of [the single employer determination] . . . are those decisions that construct the conditions of employment for employees at the plaintiff's level, including not only the hiring and firing of employees at the [plaintiff's] level, but also the hiring and firing of the manager of [the retail store] and the setting of overall policies for employee conduct and discipline." <u>Id.</u> at *5. So, despite the fact that the court in <u>Salemi</u> relied on the harasser's promotion to manager as enabling the escalation of the harassment, a fact not relevant here since

alleged harasser Robinson was not Saleh's manager, <u>Salemi</u>, still suggests that an indirect employer's actual "independent" knowledge of the harassment may not be necessary in all cases, and, importantly, supports a single employer finding here.

Furthermore, and even more critically, the fact that Pretty Girl exercised centralized control over harassment policies and complaints involving High Styles employees and those of the other Pretty Girl stores powerfully suggests the existence of a single employer. <u>See</u> <u>E.E.O.C.</u> <u>v. Moreland Auto Group, LLLP</u>, No. 11-cv-1512, 2012 WL 2974670 (D. Colo. July 20, 2012) (denying summary judgment in retaliatory termination suit where, <u>inter alia</u>, one employee prepared identical handbooks for all related entities and was the contact person for sexual harassment claims, and owner of related entities had authority over personnel decisions even though neither he nor the two entities at issue were involved in plaintiff's termination); <u>Thompson v. Sanderson Farms, Inc.</u>, No. 04-CV-837, 2006 WL 2711497 (S.D. Miss. Sept. 21, 2006) (denying summary judgment in suit alleging disparate treatment where, <u>inter alia</u>, each entity had its own human resources manager but their decisions had to comply with centralized employment policies and parent company was responsible for making final disciplinary decisions concerning violations of harassment policies); <u>but see</u> <u>Ruhling v. Tribune Co.</u>, No. 04-CV-2430, 2007 WL 28283, at *5-6 (E.D.N.Y. Jan. 3, 2007) (granting summary judgment on single employer claim in case involving harassment; although harassment policy advised employees of Newsday to contact, among other people, human resources department at the Tribune parent company and that department attempted to investigate a complaint that plaintiff sent to

Newsday's CEO, the record did not "indicate the level of day to day control over employment matters required by the single employment doctrine").[13]

Therefore, even if defendant's interrogatory responses were not treated as admissions of its employer status, factual issues would still exist as to whether Pretty Girl qualifies as Saleh's employer under the single employer doctrine. To reprise, Lavy, acting on behalf of Pretty Girl, was responsible for enforcing the anti-harassment policy at the retail stores across the board, including the Knickerbocker store, and the managers of those retail stores, who were subject to Lavy's control and supervision, were required by company policy to report complaints to Lavy. These facts and all of the other evidence concerning the extensive integration between defendant and the retail stores indicate a single employer relationship. In light of that evidence, a single employer finding by the jury is not precluded simply because: (1) Lavy was not actually notified of plaintiff's complaints; (2) Hamra was responsible for the daily management of the Knickerbocker Store; and (3) High Styles paid the Knickerbocker Store workers from its own bank account. Indeed, on these facts, such a finding by the jury might be directed by the Court at the close of the case if the evidence at trial tracks what the motion papers seem to suggest.

### C. Pretty Girl's Knowledge of Saleh's Complaints and the Reasonableness of the Response to the Complaints

Defendant argues that it cannot be liable for Robinson's harassment and assault of Saleh because it was not aware of Saleh's complaints to Hamra. Defendant also asserts that it is not

---

[13] Even assuming that <u>Ruhling</u>'s reasoning is persuasive, it is factually distinguishable from the instant case. Among other things, a harassment policy that invites employees of a large conglomerate to report complaints to numerous people up a chain of command that ultimately includes the parent company is different than the instant case where the sole person responsible for receiving and investigating harassment complaints was an executive of Pretty Girl.

liable because Hamra's responses to Saleh's complaints and Lavy's response to Robinson's assault were reasonable. Neither of these arguments justify a grant of summary judgment.

### 1. Standard for Co-Worker Harassment

An employer is liable for a "hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action.'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir. 2000) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)); see also Distasio v. Perkin Elmer Corp., 157 F.3d 55, 64 (2d Cir. 1998) ("[W]hen the harassment is attributable to a co-worker, rather than a supervisor, . . . the employer will be held liable only for its own negligence."). "This standard requires a plaintiff to show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." Duch v. Jakubek, 588 F.3d 757, 763 (2d Cir. 2009).

Although plaintiff argues that Pretty Girl should be held vicariously liable because Hamra was plaintiff's and Robinson's supervisor, Hamra was not the harasser. Thus, this case is properly is analyzed under the standard for co-worker harassment.

### 2. Pretty Girl's Knowledge of Saleh's Complaints

"The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles." Distasio, 157 F.3d at 63-64 (2d Cir. 1998). Knowledge will be imputed to the employer when:

> (A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or
> (B) the official is charged with a duty to act on the knowledge and

> stop the harassment; or (C) the official is charged with a duty to
> inform the company of the harassment.

Id. at 64 (quoting Torres v. Pisano, 116 F.3d 625, 636-37 (2d Cir. 1997)).  Defendant contends

that Saleh cannot establish liability under the first scenario outlined above because Hamra was

not part of the management of High Styles or Pretty Girl.  Assuming, arguendo, the truth of this

assertion, the claim here turns on the third scenario, which is triggered where the employee who

possesses the relevant knowledge "'has an official or strong de facto duty to act as a conduit to

management for complaints about work conditions.'"  Torres, 116 F.3d at 637 (quoting Lamb v.

Household Credit Servs., 956 F. Supp. 1511, 1517 (N.D. Cal. 1997)); see also Brunson v. Bayer

Corp., 237 F. Supp. 2d 192, 203 (D. Conn. 2002) (imputing knowledge to employer where

handbook and deposition testimony indicated that supervisor was obligated to report sexual

harassment to management).

Because the company policy of Pretty Girl and High Styles imposed a duty on Hamra to

relay harassment complaints to Lavy, there is, at best from defendant's perspective, a factual

question as to whether Hamra's knowledge of Saleh's complaints should be imputed to Pretty

Girl.  Admittedly, the "ordinary rule [is] that an employee's knowledge may be imputed only to

his employer, and not to the employer's parent company."  City of Los Angeles v. San Pedro Boat

Works, 635 F.3d 440, 453 (9th Cir. 2011) (addressing negligence claim under California law, but

not discussing whether employee of subsidiary was required by company policy to report to

parent).  However, even if Hamra was not an employee of Pretty Girl, and High Styles was not,

generally, Pretty Girl's agent or alter ego, there is still a factual question as to whether Hamra

was Pretty Girl's agent for the purpose of reporting harassment complaints.  See Distasio, 157

F.3d at 63-64 ("The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles."). Hamra was subject to the control of Lavy, who was a corporate officer of Pretty Girl and responsible for administering the chain's anti-harassment policy and was also Hamra's supervisor. Lavy had the power to fire managers (and other employees of the retail stores) and to discipline Hamra for failing to follow the company policy that required reporting of harassment complaints. Therefore, Hamra's knowledge may fairly be imputed to Pretty Girl.

A factual issue also exists as to whether Jackson's knowledge of Saleh's complaint should be imputed to defendant. The only information about Jackson's position is Saleh's statement that Jackson was the "second supervisor." Although Lavy and Hamra did not explicitly concede that an employee in Jackson's position had a duty to report harassment complaints to Lavy, the current record could support such an inference. Absent evidence to the contrary, a jury could reasonably conclude that the policy requiring managers to report harassment complaints to Lavy was also applicable to supervisors such as Jackson. See Brown v. Orange & Rockland Utilities, Inc., 594 F. Supp. 2d 382, 394-95 (S.D.N.Y. 2009) (finding fact issue on imputed knowledge in suit under § 1981 and NYSHRL where the record suggested that low-level storekeeper "was a liaison of sorts between lower-level employees and supervisors" and defendant failed to offer any evidence showing that storekeepers "do not have the responsibility to report information or incidents of harassment up the chain-of-command"). Like Hamra, Jackson was also subject to the supervision and control of Lavy, who would have been responsible for any discipline stemming from a violation of the reporting policy.

Even though there is no evidence in the record concerning the position held by the unidentified employee at Pretty Girl who was contacted by Saleh, that gap in the record is not significant. Saleh does not need to rely on that employee's knowledge because the knowledge of Hamra and Jackson can likely be imputed to defendant. Similarly, in light of Hamra's and Jackson's arguable knowledge, Saleh's failure to report his complaint directly to Lavy, in accordance with Pretty Girl's harassment policy, is not fatal to Saleh's claim either.

### 3. Reasonableness of Hamra's and Lavy's Responses

According to Second Circuit precedent,

> [w]hether the company's response was reasonable has to be assessed from the totality of the circumstances. Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment. ·

Distasio, 157 F.3d at 65.

Pretty Girl argues that Hamra's response was reasonable because, after hearing Saleh complain about the "bin Laden" comments, Hamra spoke to Robinson and those comments stopped. This argument, however, is flawed at its root. Defendant completely ignores Saleh's complaint to Jackson, which was not limited to the "bin Laden" comments. Saleh told Jackson that Robinson was hurting him, cursing his religion, and saying that Muslims are dirty and terrorists. No action was taken in response to that complaint. In addition, even if Saleh had not complained to Jackson, there may still be factual questions concerning the reasonableness of Hamra's response. "[I]f harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate." Whidbee, 223 F.3d at 72. Above

and beyond Robinson's discriminatory comments directly preceding the assault, Saleh testified

that, a short time before the assault, Saleh had again complained to Hamra about a "bin Laden"

comment. Hamra's own testimony, which is somewhat contradictory, also raises questions as to

whether the harassing conduct ceased after he spoke to Robinson.

Although defendant also relies on Lavy's termination of Robinson after the assault, even

assuming that Lavy's response to that event was reasonable, that does not answer the question of

whether the company should reasonably have done more prior to the assault, given Hamra's and

Jackson's apparent knowledge. Admittedly, even if the jury were to conclude that the company's

pre-assault response to Saleh's complaints was insufficient, defendant may still be able to

establish that the company should not be liable for Robinson's assault. For example, defendant

could attempt to argue that the company's failure to adequately respond to Saleh's complaints was

not a proximate cause of Robinson's assault because even a proper response—which may not have

required Robinson's transfer or removal from the Knickerbocker Store—would not have prevented

an assault. Similarly, although Saleh's complaints to Hamra and Jackson may have put the

company on notice that, absent sufficient remedial action, Robinson would continue to make

offensive comments, defendant might argue that none of those complaints made it reasonably

foreseeable that Robinson would engage in an assault motivated by plaintiff's national origin and

religion. However, even assuming that these would be viable theories, they certainly also raise

factual issues for the jury. Moreover, defendant, which maintains that Hamra's pre-assault

response was sufficient, has not raised these arguments. Finally, even if the company were not

liable for Robinson's assault, the question would remain whether Robinson's other conduct rose to the level of a hostile work environment for which Pretty Girl was liable.[14]

## CONCLUSION

For the reasons outlined above, Pretty Girl, Inc.'s motion for summary judgement is denied in its entirety.

Brooklyn, New York
September 19, 2012

SO ORDERED:

s/Eric N. Vitaliano

_____

Eric N. Vitaliano
United States District Judge

---

[14] In its reply brief, Pretty Girl argues, in passing, that Robinson's "bin Laden" comments that Hamra heard did not rise to the level of severity or pervasiveness necessary to establish a harassment claim. Little more need be said than to note Robinson's repeated out loud reference to Saleh on the basis of Saleh's shared religion to Osama bin Laden: a reference to the most vile figure of the Third Millennium. Furthermore, defendant's argument completely ignores the other name-calling by Robinson ("dirty Muslim terrorist"), some of which Saleh relayed to Jackson.