# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

№ 09-CV-1769 (RER)

————————————

OSAMA HAZZA SALEH,

Plaintiff,

VERSUS

PRETTY GIRL, INC., HIGH STYLES, INC., JAMES ROBINSON, AND ALBERT HAMRA,

Defendants,

————————————

**MEMORANDUM AND ORDER**

September 6, 2022

————————————

**RAMON E. REYES, JR., U.S.M.J.:**

Osama Hazza Saleh ("Plaintiff" or "Saleh") brought this action in April 2009 against his joint-and-single former employer, Pretty Girl, Inc. ("Pretty Girl") and High Styles, Inc. ("High Styles"), his former manager, Albert Hamra (with Pretty Girl and High Styles, the "Moving Defendants"), and his former co-worker, James Robinson (together, the "Defendants"), after Robinson had continually harassed Saleh at the workplace on the basis of his race, religion, and national origin, and physically attacked him in the store's basement on September 6, 2007. Plaintiff alleged that Defendants' conduct constituted, *inter alia*: (1) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); and N.Y. Exec. Law § 296 (the "New York State Human Rights Law" or "NYSHRL"); (2) common law

1

negligence; and (3) common law assault and battery. (ECF No. 1 ("Compl"); ECF No. 37 ("Second Am. Compl.") ¶ 1).[1]

After a four-day trial held from June 2, 2014 through June 6, 2014, a jury found that: (1) each of the Defendants subjected Saleh to a hostile work environment; (2) the Moving Defendants were negligent in hiring, supervising, or retaining Robinson; and (3) each of the Defendants was liable— vicariously as to the Moving Defendants, and directly as to Robinson—for the assault and battery on September 6, 2007. (See ECF No. 86 ("Special Verdict Sheet")).[2] Across all claims and defendants, the jury found that Saleh was entitled to $300,000 for emotional suffering and distress, $450,000 for past physical pain and suffering, $1,400,000 for future physical pain and suffering (covering a period of 54.8 years) and $15,000 in medical expenses. (*Id.*). In addition to those sums, the jury found that Saleh was entitled to punitive damages comprising: $1,200,000 from Pretty Girl, $1,200,000 from High Styles, and $50,000 from Hamra for the hostile work environment and negligence claims, and $100,000 from Robinson for the hostile work environment and assault and battery claims. (*Id.*). On June 13, 2014, the Court entered a judgment in Saleh's favor, awarding him damages as determined by the jury plus post-judgment interest. (ECF No. 95).

Shortly after the entry of judgment, Pretty Girl filed for bankruptcy and became subject to the bankruptcy code's automatic stay provision, 11 U.S.C. § 362. (Minute Entry dated 07/02/2014; *see also* ECF No. 1, Voluntary Petition, *In re Pretty Girl, Inc.*, No. 14-11979 (SHL) (Bankr. S.D.N.Y. July 2, 2014). Although post-trial motions were fully briefed, the automatic stay limited

---

[1] Saleh's Complaint included additional breach of contract and intentional and negligent infliction of emotional distress, which were withdrawn before trial. (*See* Second Am. Compl.; ECF No. 95).

[2] Because the jury was "instructed to apply legal principles and assign liability, 'the answers to the questions submitted to the jury [were] not special verdicts, despite the use of those words in the title appended to the form,'" but rather were written interrogatories accompanied by general verdicts under Fed. R. Civ. P. 49(b). *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002) (quoting *Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir. 1992)).

this Court's ability to resolve them. The motions were therefore "terminated without prejudice to renewal pending the bankruptcy litigation" in January 2015. (Order dated 1/12/2015). Both Plaintiff and the court-appointed trustee of Pretty Girl's estate have since kept this Court apprised of the status of the bankruptcy case, and on February 18, 2021, consented to limited relief from the stay in order permit the adjudication of these post-trial motions. (ECF Nos. 131–140, 142; *see also* ECF No. 384, Stipulation Providing Relief from Automatic Stay, No. 14-11979 (SHL) (Bankr. S.D.N.Y. Feb. 18, 2021)).

Currently before the Court are the Moving Defendants' motions under Federal Rules of Civil Procedure 50 and 59, for judgment as a matter of law ("JMOL") or, in the alternative, for a new trial or remittitur of damages. (ECF No. 105 ("High Styles & Hamra Mot."); ECF No. 116 ("Pretty Girl Mot.")). The Moving Defendants primarily argue that relief is warranted because: (1) the jury instructions and verdict sheet contained fundamental errors; (2) Plaintiff's tort claims were barred by New York's Workers' Compensation Law; (3) the verdicts on the negligence and vicarious liability claims were inconsistent; (4) the verdict on each claim was against the weight of the evidence; and (5) the damages awards were excessive. Also before the Court is Plaintiff's application pursuant to 42 U.S.C. § 1988 and Local Rule 54.1, for an award of $213,362.25 in attorneys' fees and $11,728.80 in costs through June 2014. (ECF No. 97 ("Pl's Fee App.")).[3]

For the foregoing reasons, the Moving Defendants' motions are granted in part and denied in part, and Plaintiff's application for attorneys' fees and costs is granted in part and denied in part. Specifically:

---

[3] Plaintiff's application for attorneys' fees was stayed on July 10, 2014, after Pretty Girl filed for bankruptcy. (Order dated 07/10/2014). Following the issuance of the stay, Defendants Hamra and High Styles improperly filed an affidavit opposing the application (ECF No. 113 ("Def's Opp. to Fee App.")), but quickly sought leave to withdraw the opposition without prejudice to refile to correct the error. (ECF No. 115; Order dated 09/02/2014). For the purposes of this memorandum and order, and since the stay has been lifted for post-trial matters, the Court assumes that Defendants would have refiled the same papers in opposition to Plaintiff's fee application and treats the opposition as properly filed.

(1) The Moving Defendants' motions for judgment as a matter of law are denied.

(2) The Moving Defendants' motions for a new trial are granted with respect to the Moving Defendants' liability and appropriate damages for Plaintiff's common law negligence and assault and battery claims.

(3) The Moving Defendants' motion for a new trial pursuant to Rule 59 is denied with respect to liability and compensatory damages for Plaintiff's hostile work environment claims.

(4) The Moving Defendants' motion for a new trial pursuant to Rule 59 is granted with respect to punitive damages on Plaintiff's hostile work environment claims *if* Plaintiff refuses the remittitur amounts established below. That is, a new trial will be ordered unless Plaintiff agrees within thirty (30) days from the date of this Memorandum and Order, in writing, filed electronically with the Court and served on Defendants, to accept a remittitur of the punitive damages award to $475,000 as described below.

(5) The Court awards Plaintiff $157,332.50 in attorneys' fees and $11,728.80 in expenses.

## **BACKGROUND**

I.   Pre-Trial Proceedings

Saleh commenced this action in April 2009. (Compl.). After the close of discovery, Saleh filed a Second Amended Complaint asserting claims under Title VII, Section 1981, and the NYSHRL; assault and battery; negligence; vicarious liability; breach of contract; and intentional and negligent infliction of emotional distress; all in connection with Robinson's continual harassment during the course of their employment at Pretty Girl and an incident in which Robinson punched Saleh in the face in the store's basement on September 6, 2007. (Second Am. Compl.; *see also* Minute Entry dated 06/23/2010 (noting imminent close of discovery)).

4

On December 10, 2010, Pretty Girl moved for summary judgment with respect to all claims asserted against it, arguing that Saleh and Robinson were employed exclusively by High Styles—the entity that owned and operated the Pretty Girl store where the incident occurred—and that it therefore could not be held accountable for those employees' actions. (ECF No. 48). Pretty Girl also argued that it was not aware of any harassment prior to the assault, that High Styles' pre-assault response to Saleh's complaints was reasonable, and that its own response post-assault was reasonable. (*Id.*). On September 19, 2012, the Honorable Eric N. Vitaliano, United States District Court Judge, denied Pretty Girl's motion for summary judgment in its entirety. (ECF No. 52). The parties subsequently consented to my jurisdiction on May 8, 2013. (ECF No. 53).

## II.    The Evidence at Trial

Testimony at trial revealed that, soon after immigrating to the United States, Saleh, a Yemeni Muslim, began working as a clerk at a store in Flatbush, Brooklyn, for Pretty Girl, a retail chain selling women's clothing. (Trial Tr. 29:12–19; 33:6–9; 37:7–24). After a few months, Saleh requested and received a transfer to a different Pretty Girl location on Graham Avenue in Brooklyn, where he began working with a new supervisor, defendant Albert Hamra. (Trial Tr. 37:24–39:8). When Hamra was transferred to supervise a third store on Knickerbocker Avenue, he asked that Saleh, a top performer, be transferred with him. (Trial Tr. 39:16–25; 122:9–125:12). Pursuant to Hamra's request, Saleh was transferred to the Knickerbocker store, where he began working with his brother, Mohamed Saleh, and with defendant James Robinson, both of whom were already working there as informal security personnel tasked with monitoring outdoor clothing racks for potential shoplifting and reporting any theft to the store's manager. (Trial Tr. 42:16–44:6; 127:13–128:11; 307:2–308:13; 327:18–328:17; 342:23–343:21).

At trial, Mohamed testified that Robinson harassed him when they worked together by calling him a "terrorist," a "dirty Arab," and "Bin Laden" countless times in front of customers and other employees, and that when he complained about Robinson's behavior, Hamra and other supervisors recommended that he simply try avoiding Robinson. (Trial Tr. 308:14–312:12; 328:18–330:16). Mohamed warned his brother about his experience with Robinson's harassment and advised him not to transfer to the Knickerbocker store, but Saleh accepted the transfer because he was handpicked by Hamra. (Trial Tr. 39:11–40:2; 344:3–346:11). Although the brothers worked together for a short period of time, Mohamed left the store after Plaintiff began working there to seek a better opportunity and to get away from Robinson's harassment. (Trial Tr. 43:10–44:8; 312:13–313:25).

Saleh testified that, as Mohamed predicted, Robinson began harassing him when he started working at the store, calling Saleh "bin Laden," "terrorist," and "killer," saying that his "religion [was] dirty," and saying that he was "not supposed to come to this country" in front of other employees, including Hamra. (Trial Tr. 44:9–24; 48:4–51:25). Mohamed confirmed that he also saw and heard Robinson call Saleh a "dirty Arab," a "terrorist," "part of al-Qaeda," and "Bin Laden" during their overlapping period of employment at the store, (Trial Tr. 312:13–313:13), and Saleh's step-mother, Catherine Reilly, testified that her son regularly complained to her at the time about Robinson's harassment. (Trial Tr. 383:12–384:23).

Importantly, Saleh also complained on multiple occasions to Hamra, who—despite knowing that Robinson's comments were objectively offensive and were subjectively embarrassing to Saleh—took no formal action to end the harassment beyond occasional verbal warnings to *both* Robinson and Saleh to "stop with the name calling" or else they would be "out." (Trial Tr. 48:11–20; 49:7–22; 50:13–19; 51:21–25; 53:13–54:22; 89:20; 107:5–22; 135:10–136:22; 139:18–

6

140:21;   141:19–142:15;   145:1–4;   188:4–10;   198:3–199:9).   Further,   Hamra   failed   to   report

Robinson's behavior further up the chain of command as contemplated by Pretty Girl's written

policies to his supervisor and the individual responsible for handling such complaints, Victor Lavy.

(Trial Tr. 154:10–159:1; 520:23–524:12). Saleh testified that on one occasion, Robinson became

violent after receiving a warning and attempted to attack Hamra; Saleh had to physically prevent

Robinson from entering the store to carry out the attack, and he later warned Hamra about the

danger that Robinson posed. (Trial Tr. 52:1–54:10). Hamra acknowledged hearing Robinson's

derogatory remarks toward Saleh, and acknowledged that Saleh complained about those remarks,

but denied having ever received reports of Robinson acting violently. (Trial Tr. 132:22–139:3;

140:12–142:15; 203:19–204:15; 218:12–14).

On September 6, 2007, Robinson's harassment reached its apex. After Hamra relieved

Robinson of his security post so that he could use the bathroom in the store's basement, and after

Saleh went down to the same basement to pray and to change prices on items, Robinson launched

slurs at Saleh and punched him in the face, knocking him unconscious. (Trial Tr. 55:13–56:22;

67:13–20; 80:1–81:20; 105:23–106:13). When he awoke, Saleh ran up the stairs—repeatedly

screaming "he hit me"—to report the assault to Hamra, but Hamra did not call the authorities or

otherwise take steps to apprehend Robinson. (Trial Tr. 56:19–58:19; 107:23–108:3; 145:12–

151:14; 169:16–170:13; 228:6–13). Saleh then called his father and brother, who arrived after

Robinson had already fled the scene, and they in turn called the police and an ambulance. (Trial

Tr. 109:1–4; 323:18–326:2; 339:3–340:21).

Robinson's punch fractured Saleh's left zygomatic arch—part of a bone in the face just below

the eye—which required surgery and hospitalization for approximately one week. (Trial Tr. 59:1–

66:3; 244:4–260:6). The jury heard testimony regarding the injury itself and the physical pain and

discomfort that Saleh experienced immediately following the incident and in the years leading up to trial from Saleh and from other witnesses, including an expert head and neck otolaryngologist. (Trial Tr. 70:16–75:11; 243:18–21; 261:7–270:23; 385:13–389:5). The jury also heard from lay witnesses regarding the emotional and psychological distress caused by Robinson's harassment and by the assault, including an illogical fear of Black people, self-doubt, nervousness, and paranoia, but Plaintiff proffered no expert medical testimony to corroborate those claims. (Trial Tr. 68:15–69:4; 74:1–75:11; 389:9–392:16; 401:15–405:6).[4]

A note was made in Pretty Girl's system indicating that Robinson was no longer allowed to work for the company after the assault at the Knickerbocker store; however, Robinson began working at the Graham Avenue store after the assault, continued to work there for a week, and applied to work at a different Pretty Girl store the following year. (Trial Tr. 173:15–174:24; 180:11–185:10; 512:9–514:13; 515:20–518:6; 541:6–544:12; *see also* Trial Exhibit 14). Robinson was eventually arrested for the assault on March 11, 2008, and plead guilty to the crime on May 26, 2009. (Trial Tr. 31:3–4; 76:14–77:11; *see also* Trial Exhibit 3).

III.   Rule 50 Motions

At the close of Plaintiff's case and at the close of trial, the parties moved for JMOL under Rule 50 on a number of specifically articulated grounds.

First, at the close of Plaintiff's case, the Moving Defendants sought a directed verdict on the claim of vicarious liability for Robinson's assault, arguing that Plaintiff failed to prove Robinson was acting in the furtherance of his employment, that Plaintiff failed to show Robinson was a

---

[4] Although Saleh did not present expert testimony to corroborate his emotional and psychological injuries, Defendants' expert psychiatrist indicated on direct examination that Saleh showed no signs of clinical depression or any other mental disorder upon examination (Trial Tr. 587:16–589:5), but conceded on cross examination that a person experiencing the same events and circumstances as Saleh could develop post-traumatic stress disorder. (Trial Tr. 614: 15–615:19).

known threat, and that the evidence affirmatively demonstrated Robinson attacked Saleh for purely personal reasons. (Trial Tr. 416:9–417:10; 419:11–14). In response, Plaintiff argued that Robinson's conduct was performed in the course of his duties as a "physical presence" at the store, that by ignoring numerous complaints the employer condoned and implicitly adopted Robinson's wrongful acts as their own, and that allowing Robinson to work at another Pretty Girl store served to further ratify his wrongful conduct. (Trial Tr. 417:12–419:7). The Court denied Defendants' motion, noting that Plaintiff provided sufficient evidence for a jury to find that Robinson was acting "within the scope of the employment, both temporally and in furtherance of the objectives" of the employer, that allowing Robinson to work at a different store introduced "an element of ratification after the fact," and that the foreseeability of any threat of violence from Robinson toward other employees came down to the jury's credibility findings with respect to Saleh's and Hamra's testimony. (Trial Tr. 419:15–420:5). Additionally, at the close of his case, Plaintiff moved for judgment as a matter of law as to Robinson's liability for the hostile work environment, assault, and battery claims, given Robinson's default in the case and his criminal guilty plea. (Trial Tr. 420:8–421:22). The Court granted Plaintiff's motion. (Trial Tr. 421:22).

After the close of the Defendants' presentation on liability, Plaintiff moved for a finding as a matter of law, that Pretty Girl and High Styles should be treated as a single employer rather than as separate corporate entities. (Trial Tr. 559:24– 563:8). The Court denied the motion, leaving the issue for the jury to resolve, but noted that Defendants' argument to the contrary was "bordering on frivolous," as "the evidence [was] overwhelming" in Plaintiff's favor and "there [was] no question, absolutely not, that there [was] a single employer" in the case. (Trial Tr. 563:16–564:19). Plaintiff also moved for JMOL with respect to his negligence claim, arguing that he proved Defendants failed to meet the requisite level of ordinary care by failing to implement their own

9

anti-discrimination policies, to follow up on Saleh's complaints, and to train supervisors Hamra and Lavy on dealing with discrimination, harassment, or hostile work environment claims. (Trial Tr. 564:21–565:10). The Court again denied the motion and permitted the question to go to the jury. (Trial Tr. 567:6–10).

Finally, although they did not specifically move for JMOL on these grounds, Defendants raised an issue with the jury instructions before they were read to the jury, noting that the instructions as written advised the jury of affirmative defenses available to rebut Plaintiff's hostile work environment claims, but did not advise them of affirmative defenses to his common law tort claims. (Trial Tr. 571:7–572:11). Defendants raised no specific additional affirmative defenses that they believed should have been included in the jury charge, and raised no further objections to the contents of the special verdict sheet or to the jury instructions before the case was submitted to the jury for deliberations. (Trial Tr. 569:1–570:12; 689:3–18).

## IV.   The Verdict

On June 6, 2014, the jury rendered its verdict. In response to the special verdict sheet's questions, the jury found that: (1) Plaintiff was subjected to a hostile work environment by Pretty Girl, High Styles, Hamra and Robinson; (2) Pretty Girl, High Styles, and Hamra were negligent in hiring, supervising, and/or retaining Robinson; and (3) Pretty Girl, High Styles, Hamra, and Robinson were each liable for the assault and battery on September 6, 2007. (Special Verdict Sheet; *see also* Trial Tr. 692:15–697:23).

For his hostile work environment claims, the jury found that Saleh was entitled to $100,000 in damages for emotional suffering and distress; $600,000 in punitive damages from Pretty Girl; $600,000 in punitive damages from High Styles; $25,000 in punitive damages from Hamra; and $50,000 in punitive damages from Robinson. (*Id*.).

10

For his negligence claim, the jury found that Saleh was entitled to $100,000 in damages for emotional suffering and distress, and 54.8 years of future pain and suffering; $600,000 in punitive damages from Pretty Girl; $600,000 in punitive damages from High Styles; and $25,000 in punitive damages from Hamra. (*Id.*).[5]

For his assault and battery claims, the jury found that Saleh was entitled to $100,000 in emotional suffering and distress; $450,000 for past physical pain and suffering, $1,400,000 (or 54.8 years) in future physical pain and suffering; $15,000 in medical expenses, and $50,000 in punitive damages from Robinson, specifically. (*Id.*).[6]

V.    Post-Trial Proceedings and Pretty Girl's Bankruptcy

On June 13, 2014, the Court entered a judgment in Saleh's favor pursuant to the jury's findings of fact on liability and damages (ECF No. 95). Two weeks later, Plaintiff applied for attorney's fees and costs. (Pl's Fee App.). Shortly thereafter, on July 2, 2014, Pretty Girl filed for chapter 11 bankruptcy and became subject to the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362. (Minute Entry dated 07/02/2014; *see also* ECF No. 1, Voluntary Petition, *In re Pretty Girl, Inc.*, No. 14-11979 (SHL) (Bankr. S.D.N.Y. July 2, 2014)). Plaintiff's post-trial motion for fees was accordingly stayed, since adjudication of the motion "would necessarily resolve a claim against defendant Pretty Girl, who would be jointly and severally liable for Plaintiff's fees." (Order dated 07/10/2014). Other post-trial proceedings were not stayed as to High Styles or Hamra. (*Id.* (citing Fed. R. Civ. P. 6(b)(2))). After post-trial motions were fully briefed by the Moving

---

[5] The jury was specifically instructed not to "include in these amounts any damages [it] already included" with respect to the hostile work environment claims, or "[i]n other words, [to] only include in these amounts any damages that [we]re solely attributable to and proximately caused by the assault and battery[.]" (Special Verdict Sheet).

[6] Likewise, the jury was specifically instructed not to include in these amounts any damages already included with respect to the hostile work environment claims or the negligence claims. (Special Verdict Sheet).

Defendants,[7] the parties requested a settlement conference before the Court, which was subsequently scheduled for January 15, 2015. (ECF No. 127; Order dated 12/01/2014).

On December 23, 2014, however, Pretty Girl's pending chapter 11 bankruptcy case was converted to a chapter 7 bankruptcy. (ECF Nos. 128, 129; *see also* ECF No. 142, Order Converting Chapter 11 Case, *In re Pretty Girl, Inc.*, 14-11979 (SHL) (Bankr. S.D.N.Y. Dec. 23, 2014)). The Court held a telephone conference with the parties on January 9, 2015, and at the behest of the court-appointed trustee for Pretty Girl's estate (the "Trustee"), the scheduled settlement conference was adjourned. (*Id.*; *see also* Minute Order dated 01/09/2015). On January 12, 2015, all post-trial motions before the Court were "terminated without prejudice to renewal pending bankruptcy litigation." (Order dated 1/12/2015).

In the ensuing years, Plaintiff and the Trustee regularly kept the Court apprised of the status of Pretty Girl's bankruptcy, including the status of adversary proceedings brought and judgments obtained by the Trustee to recover preferential transfers, fraudulently conveyed assets, and other debts owed to the bankruptcy estate. (ECF Nos. 131, 132, 134, 135, 136, 137, 138). In January 2020, Plaintiff requested a conference to discuss the delayed resolution of the case imposed by Pretty Girl's bankruptcy. (ECF No. 139). The Court denied Plaintiff's request because, as the Trustee noted in opposition to the request, such a conference would violate the automatic stay. (ECF No. 140; Order dated 01/22/2020).

At a status conference the following year, the Trustee indicated that he intended to file a stipulation in the pending bankruptcy case consenting to limited relief from the automatic stay with respect to the post-trial motions submitted to this Court. (Minute Entry dated 01/27/2021).

---

[7] High Styles and Hamra timely filed a joint post-trial motion for relief on July 11, 2014. (High Styles & Hamra Mot.). As permitted by the bankruptcy code, Pretty Girl also filed a post-trial motion for relief on September 2, 2014 (*See* Pretty Girl Mot.; ECF No. 116-1 ("PG's Mem.") at 1 n.1 (citing 11 U.S.C. § 108(b)(2)).

The Bankruptcy Court signed the stipulation on February 18, 2021, permitting this Court to consider and adjudicate the instant motions. (ECF No. 142; *see also* ECF No. 384, Stipulation Providing Relief from Automatic Stay, No. 14-11979 (SHL) (Bankr. S.D.N.Y. Feb. 18, 2021).

## LEGAL STANDARDS

I.   Motion for Judgment as a Matter of Law

Under Rule 50, "[i]f a party believes that 'a reasonable jury would not have a legally sufficient evidentiary basis' to find for its adversary on a particular issue, it may move for judgment as a matter of law during trial under Federal Rule of Civil Procedure 50(a) and renew the motion after trial under Rule 50(b)." *Cangemi v. Town of East Hampton*, 374 F. Supp. 3d 227, 232 (E.D.N.Y. 2019) (citing Fed. R. Civ. P. 50(a)–(b)), *aff'd sub nom. Cangemi v. United States*, 13 F.4th 115 (2d Cir. 2021). "In an order determining a Rule 50(b) motion, the district court may: '(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.'" *Id.* (citing Fed. R. Civ. P. 50(b)).

"The moving party faces a heavy burden on a Rule 50 motion." *Finkel v. Zizza & Assocs. Corp.*, No. 14-CV-4108 (JS) (ARL), 2022 WL 970670, at *4 (E.D.N.Y. Mar. 31, 2022); *see also Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) ("A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict."); *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018) (quoting *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1536 (2d Cir. 1992)) ("The [Rule 50] standard is a high one, met only in 'rare occasions.'"). A court may only grant judgment as a matter of law "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against

it." *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F3.3d 127, 133 (2d Cir. 2008)).

A Rule 50 motion must first be made before the case is submitted to the jury, and "must specify the judgment sought and the law and facts on which the moving party is entitled to the judgment." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (quoting Fed. R. Civ. P. 50(a)(2)). "After an unfavorable verdict, Rule 50(b) allows the party to renew its motion on 'those grounds that were specifically raised in the prior motion.'" *Id.* (quoting *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997)). These timing and specificity requirements ensure that the responding party is put on notice of the purportedly insufficient aspects of its case and is afforded an opportunity to cure any alleged problems with its proof before the jury has deliberated. *See id*; *see also Emmons*, 895 F.3d at 175 (first quoting *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 116 (2d Cir 2004); then quoting *Cruz v. Loc. Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994)) ("To prevent a party seeking judgment as a matter of law from 'luring his opponent into failing to present evidence that would cure the defect,' the requirement that an argument raised on a Rule 50(b) motion must have specifically been raised in a Rule 50(a) motion should not be overlooked as 'a mere technicality.'").

Accordingly, if a party fails to move for JMOL before the case is submitted to the jury, or moves on new grounds after trial, the high bar that a movant must clear under Rule 50 is elevated even further—a court may not grant such a motion except to prevent "manifest injustice." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (citing *Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012)); *see also Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998) (citations omitted) ("[A]lthough a motion for JMOL may be 'renewed' after the jury returns its verdict, it may be renewed only on grounds that were specifically

articulated before submission of the case to the jury. . . . As to any issue on which no proper Rule 50(b) motion was made, JMOL may not properly be granted by the district court . . . unless that action is required in order to prevent manifest injustice."). "Manifest injustice exists where a jury's verdict is wholly without legal support." *ING Glob.*, 757 F.3d at 97 (citing *Rothstein v. Carriere*, 373 F.3d 275, 291 (2d Cir. 2004)); *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 129 (2d Cir. 1999)).

"In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Cross*, 417 F.3d at 247–48 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see also Cangemi*, 374 F. Supp. 3d at 232 (first quoting *Rosioreanu v. City of New York*, 526 F. App'x 118, 119 (2d Cir. 2013) then quoting *Houston v. Cotter*, No. 07-CV-3256 (JFB) (AYS), 2016 WL 1253391, at *1 (E.D.N.Y. Mar. 30, 2016)) ("'When considering the evidence associated with a Rule 50(b) motion, the trial court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury,' and must view the evidence 'in the light most favorable to the nonmoving party.'").

II.   Motion for a New Trial or Remittitur

"Under Rule 59, a court may grant a motion for a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court.'" *Jennings v. Yurkiw*, No. 14-CV-6377 (SMG), 2018 WL 5630454, at *5 (E.D.N.Y. Oct. 31, 2018) (quoting Fed. R. Civ. P. 59(a)(1)(A)), *aff'd*, 18 F.4th 383 (2d Cir. 2021). The rule commits the decision to grant a new trial "to the sound discretion of the trial judge," *id.* (quoting *Crews v. Cty. of Nassau*, 149 F. Supp. 3d 287, 292 (E.D.N.Y. 2015)), and "is less stringent than Rule 50." *Finkel*, 2022 WL 970670 at *4. Indeed, the more flexible standard under Rule 59 allows a court to "grant a new trial 'even if there

is substantial evidence supporting the jury's verdict,'" and to "weigh the evidence independently, without having to view it in the light most favorable to the verdict winner.'" *Id*. (quoting *Manley v. AmBase Corp.,* 337 F.3d 237, 244–45 (2d Cir. 2003); citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1998)).

Although a movant's burden is lower under Rule 59, "[w]hen considering a motion for a new trial under Rule 59(a) on the ground that the jury's verdict is against the weight of the evidence," courts in the Second Circuit accord a "high degree of deference . . . to the jury's evaluation of witness credibility," and caution "that jury verdicts should be disturbed with great infrequency." *ING Glob.* 757 F.3d at 97–98 (quoting *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012)); *see also Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 623 (E.D.N.Y. 2020) (quoting *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, F. Supp. 3d 460, 475 (S.D.N.Y. 2014)) ("A motion to alter or amend judgment is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"). As such, where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle*, 670 F.3d at 418–19.

However, the sufficiency of the evidence is not the only ground to order a new trial. *See, e.g.*, *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673 (KAM) (JO), 2020 WL 1083771, at *4 (E.D.N.Y. Mar. 6, 2020) (quoting *Lawson v. Cty. of Suffolk*, 920 F. Supp. 2d 332, 339 (E.D.N.Y. 2013)) ("The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive."). In particular, where a court finds that the jury has

16

produced an inconsistent verdict, or has provided special verdict answers that are "ineluctably inconsistent," the appropriate remedy to provide due "deference to the parties' Seventh Amendment rights to trial by jury" is to order a new trial, rather than to grant judgment as a matter of law. *Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001) (citations omitted).

A trial judge's discretion in granting a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Kirsch*, 148 F.3d at 165 (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)); *see also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (quoting *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014)) ("Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."). A "conditional order of remittitur" is authorized "in at least two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Kirsch*, 148 F.3d at 165 (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)).

In intrinsically excessive cases, "a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Jennings*, 2018 WL 5630454, at *13 (quoting *Kirsch*, 148 F.3d at 165). "In making this determination, 'it is appropriate to review the awards in comparable cases.'" *Id.* (quoting *Jackson v. Tellado*, No. 11-CV-3028 (PKC) (SMG), 2018 WL 4043150, at *2 (E.D.N.Y. Aug. 24, 2018)). "Where remittitur is appropriate to correct a damage award deemed excessive, 'the court should

reduce the award only to the maximum amount that would be upheld by the district court as not excessive.'" *Id.* (quoting *Rangolan v. Cty. of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004); *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990)). Finally, while "Rule 59(e) permits a court to alter or amend a judgment . . . it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 (2008) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127–128 (2d ed.1995) (footnotes omitted)).

III.   <u>Motion for Attorneys' Fees and Costs</u>

"The general rule in our legal system is that each party must pay its own attorney's fees and expenses." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)). However, in federal civil rights actions, Section 1988 provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (quoting *Hensley*, 461 U.S. at 433). After determining whether a plaintiff is a prevailing party under § 1988, the Court must assess whether the attorney's fee award sought is reasonable. *See id.*

"[T]o determine a reasonable attorney's fee, a court must calculate a 'lodestar figure,' which is determined by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate." *Monette v. Cty. of Nassau*, No. 11-CV-539 (JFB) (AKT), 2016 WL 4145798, at *2 (E.D.N.Y. Aug. 4, 2016) (citing *Hensley*, 461 U.S. at 433; *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997)). "Both [the Second Circuit] and the Supreme Court have held that the lodestar

18

method . . . creates a 'presumptively reasonable fee.'" *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2007)). The lodestar method "includes most, if not all, of the relevant factors constituting a reasonable attorney's fee," and "produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 551, 553 (internal quotation marks and citations omitted). "The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (citing *Hensley*, 461 U.S. at 433)).

## DISCUSSION

The Moving Defendants primarily argue that JMOL is necessary, or alternatively that a new trial is warranted, because: (1) the jury instructions and verdict sheet contained fundamental errors; (2) Plaintiff's tort claims were barred by New York's Workers' Compensation Law; (3) the verdicts on the negligence and vicarious liability claims were inconsistent; (4) the verdict on each claim was against the weight of the evidence; and (5) the damages awards were excessive. The Court will examine each argument in turn.

I.   The Jury Instructions and Verdict Sheet Did Not Contain Error

First, the Moving Defendants independently raise new post-trial arguments that the jury instructions and verdict sheet contained errors which warrant a new trial. (*See* PG's Mem. at 15–16; ECF No. 105-11 ("HS & H Mem.") at 10–12).

Under Rule 51(b), a court "must inform the parties of its proposed instructions and proposed action on the [parties'] requests before instructing the jury and before final jury arguments," and

19

"must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b). Further, Rule 51(c) requires "that in order to preserve a claim of error on the jury instructions or verdict sheet, a party must object 'on the record, stating distinctly the matter objected to and the grounds for the objection.'" *Bauta v. Greyhound Lines, Inc.*, No. 14-CV-3725 (RER), 2020 WL 1237123, at *3 (E.D.N.Y. Mar. 13, 2020) (quoting Fed. R. Civ. P. 51(c)(1)); *see also Vogelfang v. Riverhead Cty. Jail*, No. 04-CV-1727 (SJF) (AKT), 2012 WL 1450560, at *8 (E.D.N.Y. Apr. 19, 2012) (citing *Countryman v. Farber*, 340 Fed. App'x 703, 704 (2d Cir. 2009)); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56–57 (2d Cir. 2002) ("Federal Rule of Civil Procedure 51 requires that an objection to a question on a verdict sheet or to jury instructions be made . . . before the case is submitted to the jury.")). As with Rule 50, the purpose of these timing and specificity requirements "is to allow the trial court an opportunity to cure any defects in the instructions before sending the jury to deliberate." *Jarvis*, 283 F.3d at 60.

"[I]f a party does not preserve an error in the jury instructions, 'a court may consider a plain error . . . if the error affects substantial rights.'" *Bauta*, 2020 WL 1237123, at *3 (quoting Fed. R. Civ. P. 51(d)(2)); *see also Jarvis*, 283 F.3d at 62 (citing *Shade v. Housing Auth. of New Haven*, 251 F.3d 307, 312 (2d Cir. 2001)) (noting that a court "may review jury instructions and verdict sheets for 'fundamental' error even when a litigant has not complied with the Fed. R. Civ. P. 51 objection requirements."). "Fundamental error is more egregious than the 'plain' error that can excuse a procedural default . . . and is 'so serious and flagrant that it goes to the very integrity of the trial.'" *Jarvis*, 283 F.3d at 62 (quoting *Shade*, 251 F.3d at 312–13). The presence of such error warrants an order granting a new trial. *See, e.g.*, *Tolbert*, 242 F.3d at 74; *King v. New York City*

*Bd. of Educ., C.S.D. #28*, No. 96-CV-2730 (JG), 2000 WL 1897349, at *2 (E.D.N.Y. Dec. 19, 2000).

As contemplated by Rule 51, the Court conferred with the parties three times regarding the jury instructions and the verdict sheet: first, on the morning of the third day of trial (Trial Tr. 355:10–377:12); next, on the last day of trial after the Court had provided the parties with a revised jury charge and verdict sheet (Trial Tr. 569:1–570:12); and finally, at a sidebar conference on the last day of trial, right after the jury had been charged and right before the case was submitted for deliberations (Trial Tr. 689:1–19). The Moving Defendants did not articulate the specific objections described in their post-trial motions on any of these three occasions, and agreed just before the case was submitted for deliberations that the jury instructions as read by the Court and the verdict sheet were, "indeed, plain English." (Trial Tr. 689:17–18). Therefore, the plain or fundamental error standard applies. *See Bauta*, 2020 WL 1237123, at *3; *Jarvis*, 283 F.3d at 62.

A. The Court's Vicarious Liability Instruction Contained No Error

Pretty Girl briefly argues that the Court's vicarious liability instruction contained plain error because the Court's instruction that "the employer need not have authorized the specific act in question" is "directly contrary to New York law." (PG's Mem. at 15–16 (citing *Lazo v. Mak's Trading Co.*, 84 N.Y.2d 896, 899 (1994) (Titone, J., concurring))). I disagree.

At the first opportunity for objections, Defendants articulated a separate, but similar, concern regarding the vicarious liability instruction, and requested that the Court clarify the "scope of the employment" instruction. Using specific language collected from other cases, Defendants asked that the Court instruct the jury that "'an employer may be liable so long as the tortious conduct is generally foreseeable and a [natural] incident of the employment; however, if an employee, for purposes of his own, departs from the line of duty so that, for the time being, his act or acts

constitute an abandonment of his service, the employer,' what's traditionally called the master, 'is not liable.' . . . [T]he traditional phrase is, quote 'frolic of his own,' close quote." (Trial Tr. 355:22–357:18 (citing *Higgins v. Metro-N. R. Co.*, 318 F.3d 422, 423 (2d Cir. 2003); *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932 (1999)). Plaintiff objected to the "generally foreseeable" language in this proposed instruction, noting that Defendants' "suggested changes . . . [went] beyond the scope of reasonably foreseeable" as contemplated by the Pattern Jury Instructions, and that the requested phrase "natural incident" is ambiguous. (Trial Tr. 358:10–359:24).

The Court noted at the time of the colloquy that it would "replace the second and third paragraphs of the vicarious liability assault and battery charge with a combination of Pattern Jury Instruction 2:234 [sic] and 2:237[,]" would "capture this concept of reasonable foreseeability and natural incident of the employment" (Trial Tr. 361:13–18), and ultimately instructed the jury on vicarious liability as follows:

> Under certain circumstances, an employer is liable for acts committed by its employee. Whether an employer-employee relationship exists is to be decided on the basis of evidence from which it can be found that the alleged employer exercises control, directly or indirectly, over the employee's activities. Factors such as whether the alleged employer had the authority to select, control, and discharge the employee are important in evaluating the alleged employer's control for the imposition of vicarious liability. The parties didn't dispute that defendant High Styles was Robinson's employer. You must determine, however, whether plaintiff has established by a preponderance of the evidence that defendants Hamra and Pretty Girl were Robinson's employers at the time Robinson punched plaintiff in the face. If you find that any one defendant is not an employer under this standard, you need not consider anything further on plaintiff's vicarious liability claim as to that defendant. You will enter a verdict in favor of that defendant.
>
> If, however, you find that any one defendant is an employer, you must also determine whether Robinson's act was in furtherance of that employer's business and within the scope of his authority as an employee. In this regard, you are to consider whether Robinson punched plaintiff in the face solely for personal ends, rather than in furtherance or as incident to the employers' business. As to the scope of the employee's authority, you are also to consider whether Robinson acted while engaged generally in the performance of his assigned duties or if the act was reasonably necessary or incidental to the employment. Note that the employer need

> not have authorized the specific act in question. An employer is liable for an act so
> long as the conduct is reasonably foreseeable and incidental to the employment.

(Trial Tr. 672:15–673:21).

As I noted for the parties before this language was finalized, these instructions are based on
New York's pattern jury instructions, which contain the same language to which Pretty Girl
objects: "[t]he employer need not have authorized the specific act in question." N.Y. Pattern Jury
Instr.— Civil § 2:235. Further, as the comments to the instruction note, "[a]cting within the general
scope of the employment means while engaged in the employer's business, and not that the
employee was authorized to do the particular act which occasioned the injury." *Id.* (citing *Makoske
v Lombardy*, 366 N.Y.S.2d 475 (App. Div. 1975), *aff'd* 39 NY2d 773 (1976); *Moritz v Pines Hotel,
Inc.*, 383 N.Y.S.2d 704 (App. Div. 1976)). The same language has been used by other courts in
this Circuit and has been upheld at the post-verdict stage. *See, e.g.*, *Hurt v. City of New York,* No.
15 Civ. 7612 (PKC), 2019 WL 5781990, at *4, *7–8 (S.D.N.Y. Nov. 6, 2019) (using instructions
containing the same language, noting that the instruction accurately summarizes New York law
under *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979), and rejecting defendants' objections
regarding vicarious liability issues); *Scherer v. City of New York*, No. 03 Civ. 8445 (RWS), 2007
WL 2710100, at *2, *12 (S.D.N.Y. Sept. 7, 2007) (using instructions containing the same language
and denying motion for new trial).

Since the portion of the Court's ultimate instruction to which Pretty Girl now objects is derived
directly from New York's pattern jury instructions, accurately reflects the law of the State of New
York on vicarious liability, and has been used by other courts in this Circuit, I find no plain or
fundamental error here.

B.  Including Hostile Work Environment Claim On The Verdict Sheet Was Not Erroneous

Next, High Styles and Hamra argue that Plaintiff's Second Amended Complaint did not allege violations of the federal or state statutes that impose liability for a hostile work environment and did not plead the elements required to prove a hostile work environment claim; as a result, they claim, the Court erred in asking jurors to determine whether Plaintiff "established by a preponderance of the evidence that he was subjected to a hostile work environment" on the special verdict sheet. (HS & H Mem. at 10–12). They further argue that the Defendants neither expressly nor implicitly consented to trying a hostile work environment claim before the jury, that Plaintiff's Complaint was never amended to include the claim, and that as a result, "Defendants did not prepare for this cause of action" and were unduly prejudiced. (*Id.* at 12).

As noted above, Defendants did not specifically object to the inclusion of hostile work environment claims on the special verdict sheet. However, Defendants did raise general concerns regarding a discrepancy between the proof offered at trial and the Plaintiff's pleadings in connection with the hostile work environment claim on the third day of trial during a discussion with the Court regarding the jury instructions. (Trial Tr. 369:3–372:16). Even assuming that raising the issue in this manner constituted a timely and properly preserved objection to the contents of the verdict sheet, my response from the time still stands: the Defendants had "been living with this case for seven years" and were therefore on notice of Saleh's hostile work environment claim throughout the proceedings; his allegations of severe and pervasive slurs were clearly indicative of that theory of liability; and there was "no prejudice in letting that claim go to the jury." (Trial Tr. 369:17–21; 370:23–371:5; 372:3–11). Indeed, though it was not discussed in detail at the time of the initial objection, the operative Complaint clearly contains sufficient information to put Defendants on notice of the claim, including references to a "hostile" or "adverse" work environment. (*See, e.g.*, Second Am. Compl. ¶ 19 ("Mr. Saleh's work environment became hostile

24

as it was riddled with racial animus[.]"); *id.* ¶ 39 ("[D]efendants subjected Plaintiff to an adverse work environment by failing and/or refusing to provide a safe environment and to employ procedures to prevent and deal with the discriminatory, disparate, and abusive threats, harassment, and intimidation by Defendant Robinson.").

Even if those direct allegations were absent from the Complaint, Rule 15(b) allows a party to "move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue," and "failure to amend does not affect the result of the trial of that issue." Fed. R. Civ. P. 15(b)(2). Further, as Defendants note, "when issues 'not raised by the pleadings are tried by express or implied consent of the parties,' the pleadings are, in effect, amended." (HS & H Mem. at 13 (quoting *F.A.A. v. Landy*, 705 F.2d 624, 633 (2d Cir. 1983); Fed. R. Civ. P. 15(b)(2)). Courts in this Circuit have held that "a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d Cir. 2000); *see also New York State Elec. & Gas Corp. v. Sec'y of Lab.,* 88 F.3d 98, 104 (2d Cir. 1996) ("In assessing whether the pleadings should conform to the proof, the pivotal question is whether prejudice would result.").

Although raising these concerns at trial belies Defendants' express consent to an amendment, "[a] party's implied consent can be found in, for example, actually litigating an issue, prompting witness testimony on the issue, briefing the issue, or raising the issue at oral argument." *Ho Myung Moolsan, Co. v. Manitou Min. Water, Inc.*, No. 07 Civ. 7483 (RJH), 2010 WL 4892646, at *13 (S.D.N.Y. Dec. 2, 2010) (citations omitted), *aff'd*, 501 F. App'x 85 (2d Cir. 2012). The record reveals that Defendants were actively litigating the issue throughout these proceedings before raising an objection: they briefed the hostile work environment claim on summary judgment, specifically arguing that Saleh failed to establish "vicarious liability in a hostile work environment

action," (*see* ECF No. 48-15, ("Def's Summ. J. Br.") at 14–16); previewed the issue for the jury during their opening statement (*see* Trial Tr: 25:13–16 ("Based on the evidence that you will hear specifically that my client did not discriminate against the plaintiff or even create a hostile-work environment."); learned that the Court clearly contemplated a hostile work environment claim on the first day of trial (*see* Trial Tr. 46:1–24 (sidebar conference regarding Defendants' hearsay objections in which the Court noted that if Defendants were "right on [their] argument, no one could ever prove a hostile-work environment claim based on things said to them.")); and specifically sought to elicit testimony to rebut the claim at trial (Trial Tr. 214:11–13 (Q: "Going back to your couple of conversations that you had with Mr. Saleh about the name-calling, did Mr. Saleh ever tell you that he was working in a hostile environment"; *id.* 233:2–5 (Q: "Now, I asked you whether Mr. Saleh ever complained about a hostile environment, correct? . . . What does the term 'hostile environment mean.'").

Based on these illustrative examples, the Court rejects Defendants' arguments that they did not implicitly consent to an amendment of the pleadings, that they did not have an opportunity to prepare a defense to a hostile work environment claim, or that they were otherwise caught unaware by the inclusion of the claim on the verdict sheet. Further, "[b]ecause I conclude that the unpleaded issue was impliedly consented to, [Plaintiff is] 'entitled to mandatory amendment of the pleadings.'" *CIT Bank, N.A. v. Zisman*, No. 17-CV-02126 (CBA) (RER), 2021 WL 3354047, at *7 (E.D.N.Y. Mar. 1, 2021) (quoting *Hamilton v. Accu-Tek*, 62 F. Supp. 2d 802, 816 (E.D.N.Y. 1999), *vacated on other grounds sub nom. Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21 (2d Cir. 2001)).

Indeed, it is clear from Defendants' actions, the allegations in Plaintiff's Complaint, and the evidence and arguments presented throughout these proceedings, that Plaintiff brought a hostile

work environment claim against the Defendants. *See Cruz*, 202 F.3d at 568 ("While we acknowledge that Cruz might have stated her claim of hostile work environment harassment more artfully, the essential elements of the charge do appear in the complaint. . . . The totality of the circumstances convinces us that, despite Cruz's imprecise complaint, the district court was correct in considering Cruz's hostile work environment claim on the merits."). Since Rule 15(b) permits the amendment of pleadings "even after judgment . . . to conform them to the evidence," and since Defendants were on notice of Plaintiff's claim and would not be prejudiced by such an amendment, the Court considers the Complaint to be amended.

Thus, including the claim on the verdict sheet did not constitute a plain or fundamental error warranting a new trial.

## II.   Defendants Waived the Workers' Compensation Affirmative Defense

Next, Pretty Girl argues that "[s]ubmitting Saleh's common law negligence and vicarious liability claims to the jury was manifestly unjust" because the "exclusive remedy provision" of the New York Workers' Compensation Law bars Saleh from recovering under his negligence and vicarious liability claims. (PG's Mem. at 13–15). Because Pretty Girl did not previously move for JMOL on these grounds, it concedes that the Court may only set aside the verdict to avoid manifest injustice. (PG's Mem. at 13 n.8); *see also ING Glob.*, 757 F.3d at 97.

### A.   Defendants Ignored the Workers Compensation Defense Through the "Point of Final Disposition"

Pretty Girl correctly notes that the exclusive remedy provision ordinarily precludes direct liability for negligence claims—including negligent retention and supervision claims based on an alleged hostile work environment—and precludes vicarious liability for intentional torts. *See* N.Y. Workers' Comp. Law § 11 ("The liability of an employer prescribed by the last preceding section shall be exclusive and in place of any other liability, whatsoever, to such employee . . . on account

of such injury . . . or liability arising therefrom[.]"); *see also id.* § 29(6) ("The right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee . . . when such employee is injured . . . by the negligence or wrong of another in the same employ[.]"); *Corrado v. N.Y. Unified Court Sys.*, 163 F. Supp. 1, 26 (E.D.N.Y. 2016) (quoting *D'Annunzio v. Ayken, Inc.*, 25 F. Supp. 3d 281, 294 (E.D.N.Y. 2014)) (collecting cases and noting that "[i]t is well settled within the Second Circuit that 'common law negligence claims are barred by the New York[] Workers' Compensation Law.'"); *Bass v. World Wrestling Fed'n Ent., Inc.*, 129 F. Supp. 2d 491, 509 (E.D.N.Y. 2001) (citations omitted) ("An employer's intentionally tortious acts are exempted from § 11's exclusivity provision" but "the employer must be directly liable for its own intentional torts which triggers the exception; vicarious liability alone will not overcome the exclusivity provision.").

Although the exclusive remedy provision of the workers' compensation statute is an affirmative defense which should be raised in a defendant's answer, "waiver is accomplished only by a defendant ignoring the issue to the point of final disposition itself." *Zapata v. Riverside Study Ctr., Inc.*, No. 10 Civ. 6283 (CM), 2012 WL 1744792, at *8 (S.D.N.Y. May 16, 2012) (quoting *Murray v. City of New York*, 43 N.Y.2d 400, 407 (N.Y. 1977)); *see also Sanders v. City of New York*, No. 16-CV-06526 (CBA) (SJB), 2022 WL 418216, at *2 (E.D.N.Y. Jan. 24, 2022) (quoting *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008)) ("[I]n federal court, affirmative defenses are subject 'to forfeiture if not raised in a timely fashion.'"); *Anthony v. City of N.Y.,* 339 F.3d 129, 138 n.5 (2d Cir. 2003) ("Although affirmative defenses . . . must be pleaded in response to a pleading, *see* Fed. R. Civ. P. 8(c), the district court may, in its discretion, construe a motion for summary judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend the defendant's answer.").

28

Courts may consider "the point of final disposition" to be reached when a finding has been made as to damages. *See Goodarzi v. City of New York*, 217 A.D.2d 683, 684 (App. Div. 1995) (citing *Leone v. Columbia Sussex Corp.,* 203 A.D.2d 430, 431 (App. Div. 1994)). Accordingly, courts applying New York's Workers' Compensation statute generally permit defendants to raise the exclusive remedy "defense for the first time" and amend their pleadings at later stages of litigation, including summary judgment, "in the absence of bad faith or undue prejudice." *Ellis v. Washington*, 409 F. Supp. 3d 148, 157 (W.D.N.Y. 2019) (citing *Carnley v. Aid to Hosps*., 975 F. Supp. 252, 254 (W.D.N.Y. 1997); *Zapata*, 2012 L 1744792, at *8); *see also Caceras v. Zorbas*, 148 A.D.2d 339, 340 (App. Div.), *aff'd*, 74 N.Y.2d 884 (1989) (permitting amendment to answer on eve of trial despite the court's "disapproval of the unwarranted and inordinate delay by defendant").

Here, Defendants failed to articulate the workers' compensation exclusive remedy affirmative defense in any of their five answers. (*See* ECF Nos. 10, 12, 29, 37, 41). Similarly, the workers' compensation defense was not mentioned in the joint pre-trial order, which listed the "Defendants' defenses which remain to be tried." (*See* ECF No. 58 ("Joint Pre-Trial Order") at 3–6). As Plaintiff notes in his response, Pretty Girl "had ample opportunity before and during the trial to raise any arguments it had with respect to" the applicability of the exclusive remedy, but "did not do so." (ECF No. 122 ("Pl's Opp. to PG") at 11); *see also Hightower v. Nassau Cty. Sheriff's Dep't,* 325 F. Supp. 2d 199, 205 (E.D.N.Y.), *vacated in part on reconsideration*, 343 F. Supp. 2d 191 (E.D.N.Y. 2004) (finding waiver of affirmative defense and denying leave to amend where defendants "failed to move to amend their answer" for twenty-three months after a change in relevant law in the Second Circuit, failed to "file a motion to dismiss or motion for summary

judgment to dismiss the complaint on the basis of" that affirmative defense, and "waited until the eleventh hour at the trial for leave to amend their answer.").

Nevertheless, Pretty Girl responds that there "has been no 'final disposition' and thus no waiver, because numerous issues remain outstanding, including questions of remittitur, adjustments to the jury's award, and retrial of liability and damages, as well as Saleh's motion for attorney's fees." (ECF No. 124 ("PG's Reply") at 5–6 (citing *Goodarzi*, 217 A.D.2d at 684; *Raptis v. Juda Constr., Ltd.*, 26 A.D.3d 153, 155 (App. Div. 2006)). In doing so, Pretty Girl misrepresents the case law: in *Goodarzi*, where defendants sought leave to amend just after summary judgment and prior to trial, the appellate division found that "because there was no finding as to damages, final disposition ha[d] not been reached." *Goodarzi*, 217 A.D.2d at 684. In *Raptis*, the appellate division found that the issue was timely raised where defendant first moved to dismiss "immediately prior to summation" and raised the issue for the second time in its post-trial motion. *Raptis*, 26 A.D.3d at 155. Unlike in either of the cases Pretty Girl cites, the exclusive remedy issue was raised here for the first time after trial, and after the jury made a finding as to damages. Because the jury made a determination as to damages, there has been a "final disposition" here such that the workers' compensation defense was waived.

## B. Amending Defendants' Answer Is Inappropriate Under the Circumstances

While Defendants' waiver of the affirmative defense could be resolved by construing its request for judgment as a matter of law or for a new trial as a request to amend its answer, the Court finds that granting such a thirteenth hour request would be unduly prejudicial to Plaintiff and is therefore unwarranted.

"As a general rule, mere delay, 'absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.'" *Tokio Marine & Nichido Fire Ins.*

*Co. v. Calabrese*, No. 07-CV-2514 (JS) (AKT), 2011 WL 5976076, at \*7 (E.D.N.Y. Nov. 28, 2011) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)). However, when "a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay." *Id.* (quoting *State Farm Mut. Auto. Ins. v. CPT Med. Servs., P.C.*, 246 F.R.D. 143, 147 (E.D.N.Y. 2007). "In gauging prejudice, courts consider, among other factors, whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Id.* (internal quotation marks and citations omitted).

Pretty Girl offers no explanation for its long delay in raising its workers' compensation defense, which came for the first time years after the initial answer was filed in September 2009 (ECF No. 10), years after filing four subsequent amended answers, (ECF Nos. 12, 29, 33, 41), and months after the entry of judgment (ECF No. 95). Such an unexplained and inexplicable delay is an important factor in finding undue prejudice here. *See, e.g.*, *In re Cross Media Mktg. Corp.*, 367 B.R. 435, 446 (Bankr. S.D.N.Y. 2007) ("[O]n the eve of trial and almost one year after Defendants submitted their amended answer, to allow Defendants now to raise these [affirmative *res judicata*] defenses, would unduly prejudice the Plaintiff."); *Hightower*, 325 F. Supp. 2d at 205 (denying amendment where "defendants waited until the eleventh hour at the trial for leave to amend their answer."). However, since delay alone is not an appropriate basis to deny leave to amend, the Court must consider Pretty Girl's additional arguments regarding prejudice.

First, Pretty Girl argues that because "Saleh's employment relationship with Pretty Girl was a central issue in the case," he "cannot claim prejudice, surprise or lack of notice of the Exclusive Remedy Provision." (PG's Reply at 6). As Saleh notes, however, Pretty Girl's post-verdict attempt

to argue the applicability of the workers' compensation statute is antithetical to both Pretty Girls' and High Styles' arguments throughout this litigation that they were never Saleh's employer. (Pl's Opp. to PG at 12; *see also* Trial Tr. at 561:20–564:10 (colloquy regarding Plaintiff's motion for JMOL regarding single employer issue after close of Defendants' liability case, in which Defendants argue Saleh was supervised and paid by High Styles rather than Pretty Girl). Indeed, High Styles continues to deny its status as an employer. (HS & H Mem. at 15–16 ("High Styles, Inc. was an improper party to this action from start to finish. . . . Plaintiff was . . . not employed by both Corporate Defendants.")). And, as Plaintiff notes, Defendants provided no documentation and presented no witnesses regarding the availability of workers' compensation coverage. (Pl's Opp. to PG at 12–13).

However, Pretty Girl argues that "because the question of [Saleh's] employment relationship with Pretty Girl was so obvious, it was *Saleh's* burden to prove that Pretty Girl *lacked* [workers' compensation] coverage, and his failure to do so requires dismissal of his common law claims." (PG's Reply at 6–7) (emphasis in original). Setting aside the fact that Pretty Girl now describes as "obvious" a fact that they disclaimed through trial, the Court finds that since the Defendants failed to interpose their affirmative defense, and indeed disclaimed Saleh's employment status, Plaintiff's counsel was not on notice of the need to request the production of documents related to workers' compensation coverage such that he can be faulted for failing to present it at trial. *See Hightower*, 325 F. Supp. 2d at 205. The identity of Saleh's employer has indeed been an issue throughout the litigation, but where both potential employers continued to disclaim his status as their employee throughout trial and after a verdict was reached, the Court will not presume that he was on notice of a workers' compensation defense or that he should have taken discovery on the issue.[8]

---

[8] Pretty Girl also suggests that Saleh was "plainly on notice" of its workers' compensation exclusivity defense because Pretty Girl "asserted the affirmative defense that 'Title VII is an exclusive remedy and all claims asserts by

Since Defendants have provided no excuse for their long delay in asserting the workers' compensation defense, since amending Defendants' answer would require additional discovery regarding the availability of workers' compensation coverage, and would even further delay resolution of this dispute, the Court finds that an amendment would be unduly prejudicial to Plaintiff. Further, because Defendants waived the workers compensation defense, the jury's verdicts on Plaintiff's negligence and vicarious liability claims were not "wholly without legal support" such that its verdicts constituted "manifest injustice." Accordingly, Pretty Girl's motion for judgment as a matter of law on the basis of the applicability of the workers' compensation exclusive remedy provision is denied.

III.   The Jury Reached Inconsistent Verdicts on Plaintiff's Negligence and Vicarious Liability Claims, Warranting a New Trial

Pretty Girl argues that a new trial is warranted because the jury's finding of liability as to both the negligent supervision and vicarious liability claims was contrary to New York law and to the Court's express instructions. (PG's Mem. at 19–20). In particular, Pretty Girl notes that under New York law, vicarious liability for assault is conditioned upon a finding that Robinson was acting *within* the scope of his employment, and liability for negligent hiring, training, or retention is conditioned upon a finding that Robinson was acting *outside* the scope of his employment. (*Id.* at 19–20). As Pretty Girl aptly notes, "it is one or the other, not both." (*Id.* at 19). Although Pretty Girl failed to bring this inconsistency to the Court's attention before the jury was dismissed, the Court agrees that the error is sufficiently egregious such that a new trial is warranted.

---

plaintiff . . . are barred.'" (PG's Reply at 6 n.2). Pretty Girl cites, and this Court has found, no authority to support the proposition that articulating one affirmative defense puts a plaintiff on notice regarding a second, unpleaded defense. As a result, the Court finds that this argument lacks merit.

### A. Defendants Waived the Inconsistent Verdict Argument

"When a jury returns a verdict by means of answers to special interrogatories, the findings must be consistent with one another, as they form the basis for the ultimate resolution of the action." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir. 2006) (citing *Crockett v. Long Island R.R.*, 65 F.3d 274, 278 (2d Cir. 1995)). "If 'the jury's answers cannot be harmonized rationally, the judgment must be vacated and a new trial ordered.'" *Id.* (quoting *Crockett*, 65 F.3d at 278). Courts generally assess objections to the consistency of a jury's verdicts under Federal Rules of Civil Procedure 49 and 51, which impose separate timing requirements on a party's objections.

As noted above in Section I, objections to the contents of jury instructions or a verdict sheet are properly brought under Rule 51. *Jarvis,* 283 F.3d at 56–57. Accordingly, where a party traces an inconsistency "between two general verdicts . . . to an alleged error in the jury instruction or verdict sheet," an objection must be made "before the jury retires to deliberate." *Id.* at 56. However, where inconsistent verdicts are not attributable to errors in the jury instructions or the verdict sheet, but are "solely attributable to the jury's failure to apply the [Court's proper] instructions," the time to object is governed by Rule 49, rather than Rule 51. *Kosmynka*, 462 F.3d at 85–86.

Under Rule 49, a party may object to inconsistencies in the interrogatories returned by a jury, but waives such objections if it fails to raise them before the jury is dismissed. *Jarvis*, 283 F.3d at 56; *see also Perez v. Cty. of Rensselaer*, New York, 858 F. App'x 12, 14 (2d Cir. 2021) ("Defendants waived their Rule 49(b) motion, [seeking a new trial based on inconsistent verdicts] however, by failing to make known its complaint before the jury was discharged.") (internal quotation marks and citations omitted)); *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015) (quoting *Kosmynka*, 462 F.3d at 83) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to

the excusing of the jury."); *Graham v. City of New York*, 128 F. Supp. 3d 681, 712 (E.D.N.Y. 2015) ("Defendants failed to raise their inconsistency objection prior to the jury's discharge, and thus have waived this argument."). Like the timing requirements of Rules 50 and 51, "the timely objection requirement [of Rule 49] is not merely a technicality—it serves to give the court and the opposing party the opportunity to correct an error in the conduct of the trial." *Anderson Grp, LLC*, 805 F.3d at 47.

Here, Pretty Girl argues that the Court properly instructed the jury that its findings on negligence and vicarious liability for assault should be mutually exclusive. (PG's Mem. at 19–20). Thus, under Rule 49, Defendants should have objected to the inconsistent verdicts before the jury was discharged. *Kosmynka*, 462 F.3d at 85–86. However, it is indisputable that Defendants first challenged the consistency of the jury's verdicts in their post-trial motion, well after the jury was discharged, and accordingly failed to preserve the inconsistency argument. (Trial Tr: 697:16–700:5 (no objections between the return of the jury's verdict and the conclusion of trial)). *Cf. Kosmynka*, 462 F.3d at 82–83 (finding that defendant "preserved its objection to the inconsistent verdict by bringing the anomaly to the court's attention at a time when it could be cured" before the jury was dismissed).

However, such "[w]aiver may be excused if a verdict constitutes 'fundamental error' that is 'so serious and flagrant that it goes to the very integrity of the trial.'" *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 624 (E.D.N.Y. 2020) (first quoting *Perks v. Town of Huntington*, 234 Fed. App'x 8, 11 (2d Cir. 2007); then quoting *Jarvis*, 283 F.3d at 62). Despite Defendants' waiver, the Court must therefore determine whether the jury's verdicts were inconsistent, and whether that inconsistency was "so serious and flagrant" that a new trial is warranted.

35

B.  <u>The Verdicts Are Fundamentally Inconsistent Such That Waiver Is Excusable</u>

"Under New York law, a verdict is inconsistent if a jury's finding 'on one claim necessarily negates an element of another cause of action.'" *Kosmynka*, 462 F.3d at 86–87 (quoting *Barry v. Manglass*, 432 N.E.2d 125, 126 (N.Y. 1981)). "[W]hen faced with such an inconsistency, 'a reviewing court must adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 598 (2d Cir. 2001) (quoting *Brooks v. Brattleboro Mem. Hosp.*, 958 F.2d 525, 529 (2d Cir. 1992). "If no such resolution is possible, the Seventh Amendment requires that the court order a new trial." *Id.* (citations omitted); *see also Kosmynka* 462 F.3d at 82 (quoting *Crockett*, 65 F.3d at 278) ("If 'the jury's answers cannot be harmonized rationally, the judgment must be vacated and a new trial ordered.'").

Pretty Girl argues that it cannot be both vicarious liable for Robinson's assault—which required a finding that Robinson was acting within the scope of his employment when he punched Saleh—and directly liable for negligently hiring, supervising, or retaining Robinson—which requires a finding that Robinson was acting outside the scope of his employment when he punched Saleh. (PG's Mem. at 19–20); *see also Collins v. City of New York,* 923 F. Supp. 2d 462, 480 (E.D.N.Y. 2013) (quoting *Newton v. City of New York*, 681 F.3 Supp. 2d 473, 488 (S.D.N.Y. 2010)) (noting that "a claim for negligent hiring or supervision can only proceed against an employee acting outside the scope of her employment," and that "an employer will be vicariously liable for employees acting within the scope of their employment.")); *Antic v. City of New York*, 273 F. Supp. 3d 445, 460 (S.D.N.Y. 2017) (quoting *Velez v. City of New York*, 730 F.3d 128, 137 (2d Cir. 2013)) ("[A] negligent hiring, training, and supervising claim requires proof that the alleged wrongful conduct occurred 'outside the scope of employment.'"), *aff'd* 740 F. App'x 203 (2d Cir. 2018)); *Doe v. Guthrie Clinic, Ltd*., 22 N.Y.3d 480, 485 (2014) (citing *Judith M. v. Sisters*

*of Charity Hosp.*, 93 N.Y.2d 932, 934 (1999)) ("In cases where an injured plaintiff's cause of action fails because the employee is acting outside the scope of employment, a direct cause of action against the . . . corporation for its own conduct, be it negligent hiring, supervision or other negligence, may still be maintained.")).

In *Kosmynka*, the Second Circuit found that it was impossible to harmonize the jury's inconsistent answers where it returned a verdict for plaintiff on his negligence claim and for defendant on his strict products liability claim despite the trial court's clear instruction that "a finding of negligence mandated a corollary finding of strict products liability," and remanded the case for a new trial. *Id.* at 87. Similarly, here, the Court specifically instructed the jury that "an employer is vicariously liable only if the employee acts within the scope of his employment," and that "if you find that Robinson acted *within* the scope of his employment when he punched plaintiff in the face, you will enter a verdict in favor of the defendants on the negligence claims." (Trial Tr. 674:10–15). The Court also specifically instructed that "if, on the other hand, [it found] that Robinson acted *outside* the scope of his employment, and that the defendant is an employer, [it] must consider whether that defendant failed in the duty to use reasonable care in the employment, training, and supervision of Robinson." (Trial Tr. 674:15–20). As was the case in *Kosmynka*, the Court clearly instructed the jury, and is unable to reconcile these two verdicts, where one necessarily rules out the other.

In an attempt to harmonize the verdicts, Saleh argues that the jury's findings of liability relate to two different employees: first, the jury found that Pretty Girl negligently supervised Robinson which led to the attack, and second, the jury found High Styles and Pretty Girl vicariously liable, "notwithstanding scope of employment," for Saleh's injuries as a result of their negligent training of Hamra on their discrimination policy. (Pl's Opp. to PG at 20). Specifically, Saleh notes that the

37

jury was presented with sufficient evidence to find that the defendants failed "to properly train Hamra on how to respond to Robinson's actions," and that "the question posed to the Jury on the verdict sheet did not limit their evaluation of negligent training to any one employee." (*Id.* at 21–22). *See also Ferreira v. City of Binghamton,* 975 F.3d 255, 276–79 (2d Cir. 2020) (finding no inconsistency between jury's conclusion that individual police officer was not negligent in shooting plaintiff during no-knock drug raid but that his employer was negligent under a *respondeat superior* theory because the verdict form did not specify that the jury could only impose *respondeat superior* liability on the City on the basis of that individual officer's actions, and because there was sufficient evidence at trial for the jury to reasonably conclude that other City employees were negligent).

Unlike in *Ferreira*, Saleh's argument runs contrary to the Court's specific instructions, which explained that the two theories of liability were mutually exclusive. *Cf. Ferreira*, 975 F.3d at 364 ("The court instructed the jury that it could find the City liable for negligence either on the basis of negligence on the part of Miller in shooting Ferreira or on the basis of negligence of the other police officers in their preparation for the entry."). The Court's vicarious liability instruction directed the jury to consider whether "Hamra and Pretty Girl were Robinson's employers at the time Robinson punched Plaintiff in the face," and "whether Robinson's act was in furtherance of that employer's business and within the scope of his authority as an employee." (Trial Tr. 672:25–673:11). Contrary to Saleh's argument, the Court did not instruct the jury that it could find Pretty Girl or High Styles vicariously liable for Saleh's injuries based on Hamra's failure to prevent discrimination or harassment, or based on the companies' failure to train Hamra on how to respond to Robinson's actions. And while Saleh argues that the verdict sheet did not limit the jury to evaluate negligent training of any one employee, the Court notes that it did not specifically request

that the jury evaluate negligent *training* of *any* employee; rather, it asked the jury to determine whether Hamra, High Styles, and Pretty Girl "were negligent in hiring, supervising and/or retaining defendant James Robinson." (Special Verdict Sheet).[9]

As a result, the Court finds that the jury's verdicts are irreconcilably inconsistent. Further, because the inconsistency is contrary to basic concepts of tort law, the Court finds that the error is sufficiently serious such that a new trial on the negligence and vicarious liability claims is warranted despite Defendants' failure to object before the jury was discharged. *See Rodick v. City of Schenectady*, 1 F.3d 1341, 1348 (2d Cir. 1993) (excusing waiver and ordering new trial where "the jury instructions accurately described the law as far as they went," where "the verdict is so contrary to basic concepts of *respondeat superior* that it would be a miscarriage of justice to let it stand," and where "the judgment entered on the verdict was inconsistent with New York state law of joint and several liability[.]"); *Niagara Mohawk Power Corp.*, 252 F.3d at 599 (vacating judgment with respect to two "irreconcilably inconsistent" claims and remanding for a new trial).

Accordingly, the Court grants the Moving Defendants motion for a new trial as to liability and damages for Plaintiffs' common law negligence and assault and battery claims.[10]

IV.     The Jury's Hostile Work Environment Verdict Was Not Against the Weight of the Evidence

The Moving Defendants argue that the jury's verdict as to each claim was against the weight of the evidence, such that JMOL or a new trial are warranted. However, because a new trial on

---

[9] While sufficient evidence was put to the jury to demonstrate that High Styles and Pretty Girl breached a duty to reasonably supervise or remove Robinson, the jury was asked whether that breach led to the September incident and caused Saleh's injuries. As the jury was instructed, the scope of employment was a threshold issue in making that determination, and it could not find for Saleh on both the vicarious liability and the negligent hiring, supervision, or retention claims in connection with those injuries.

[10] Although the Moving Defendants are granted a new trial as to their vicarious liability for Plaintiff's assault and battery claims, Defendant Robinson remains directly liable as a matter of law for those claims. (Trial Tr. 421:22) (granting Plaintiff's motion for JMOL as to Robinson's liability for the hostile work environment, assault, and battery claims based on his default and criminal guilty plea).

liability is warranted with respect to Saleh's negligence and vicarious liability claims, I will only assess the weight of the evidence with respect to Saleh's hostile work environment claims.

As noted above, a party may move for JMOL under Rule 50 if it "believes that 'a reasonable jury would not have a legally sufficient evidentiary basis' to find for its adversary on a particular issue." *Cangemi*, 374 F. Supp. 3d at 232 (quoting Rule 50(a)). "In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Cross*, 417 F.3d at 247–48 (quoting *Reeves*, 530 U.S. 133, 150 (2000)). If a party moves for JMOL on new grounds after trial, a court may not grant the motion except to prevent "manifest injustice." *ING Glob.*, 757 F.3d at 97 (citing *Lore*, 670 F.3d at 153). A court may grant a new trial under Rule 59 "even if there is substantial evidence supporting the jury's verdict," and may "weigh the evidence independently, without having to view it in the light most favorable to the verdict winner." *Finkel*, 2022 WL 970670 at *4 (citations omitted). However, "[w]hen considering a motion for a new trial under Rule 59(a) on the ground that the jury's verdict is against the weight of the evidence," courts afford "high degree of deference . . . to the jury's evaluation of witness credibility." *ING Glob.* 757 F.3d at 97–98 (quoting *Raedle*, 670 F.3d at 418).

Pretty Girl argues that JMOL or a new trial is warranted and that the jury's verdict on Saleh's hostile work environment claims under Title VII, Section 1981, and NYSHRL should be set aside because he did not present evidence of conduct that was sufficiently pervasive or severe to prove his claim, and because Pretty Girl affirmatively established that prompt and appropriate corrective action was taken in response to Plaintiff's complaints. (PG's Mem. at 22–24). Since Defendants have not previously moved on these grounds, the "manifest injustice" standard applies, and the

Court will only grant JMOL if the jury's verdict was "wholly without legal support." *ING Glob.*, 757 F.3d at 97.

Considering the evidence in the light most favorable to the Plaintiff, the Court finds that a reasonable jury would not have been compelled to find in the Defendants favor with respect to the hostile work environment claims, and that the jury's verdict was not "wholly without legal support." Further, after undertaking an independent assessment of the evidence adduced at trial and giving proper deference to the jury's credibility findings, the Court finds that a new trial on the Defendants' liability for the hostile work environment claims is not warranted.

A. Hostile Work Environment Standard

"[A] hostile work environment is one form of disparate treatment on the basis of 'race, color, religion, sex, or national origin.'" *United Health Programs of Am., Inc.*, 2020 WL 1083771, at *5 (quoting *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)). As applied to this case, "[t]he standard for showing a hostile work environment under Title VII, Section 1981 . . . and the New York State Human Rights Law is essentially the same." *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) (citing *Schiano v. Quality Payroll Sys's., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004)). "[T]o prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)); *see also Harris v. Forklift Sys's., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)) (hostile work environment

claim requires a showing that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'").[11] This in turn requires that a plaintiff demonstrate that, "[u]nder the standard of reasonableness, the harassment must be 'of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *United Health Programs of Am., Inc.*, 2020 WL 1083771, at *5 (quoting *Torres v. Pisano,* 116 F.3d 625, 632 (2d Cir. 1997)). The victim must also "subjectively perceive the environment to be abusive" in order to state a "cognizable hostile work environment claim." *Id.* (citations omitted).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . No single factor is required." *Harris*, 510 U.S. at 23; *see also United Health Programs of Am., Inc.*, 2020 WL 1083771, at *5 (quoting *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)) ("a hostile work environment claim analyzes a workplace environment as a whole to discover whether it is abusive."). Incidents that occurred outside the plaintiff's presence or that are not directed specifically at the plaintiff, but that nevertheless demonstrate an overall hostile or abusive environment, are also relevant in determining whether a work environment was hostile. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) ("Because the analysis of severity and pervasiveness looks to the totality of the circumstances, the crucial inquiry focuses on the nature of the workplace environment as a

---

[11] In October 2019, the NYSHRL was amended to explicitly remove the "severe or pervasive" requirement from state discrimination claims. N.Y. Exec. Law § 296(1)(h). The relaxed standard applies only to claims filed on or after October 11, 2019, and is therefore inapplicable here.

whole, and a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.") (internal quotation marks and citations omitted).

Although "[i]ncidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment," a court must not focus only on "how long the . . . slurs, verbal assaults, or obnoxious course of conduct lasts." *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation marks and citations omitted); *see also United Health Programs of Am., Inc.*, 2020 WL 1083771, at *11 (quoting *Schiano*, 445 F.3d at 597) ("The Second Circuit has made clear that even a single severe incident could create a hostile work environment 'even in isolation, unrepeated and unaccompanied by other conduct.'"). *But see Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citations omitted) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."). In addition to duration, "the offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." *Whidbee*, 223 F.3d at 69.

"An employer is liable for a hostile work environment in the workplace when the employer knew, or should have known, of the hostile work environment but failed to take appropriate remedial action." *D'Annunzio v. Ayken, Inc.*, 25 F. Supp. 3d 281, 290 (E.D.N.Y. 2014) (citing *Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)). "The sufficiency of an employer's remedial actions is evaluated under the totality of the circumstances." *Id.* (citing *Duch*, 588 F.3d at 766). An employer establishes an affirmative defense to a hostile work environment claim where it shows "(1) 'the employer

exercised reasonable care to prevent and correct promptly any discriminatory harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

B.  The Evidence at Trial

Plaintiff presented abundant evidence at trial to demonstrate to a jury that, under the totality of the circumstances, his workplace was sufficiently hostile such that the verdict in his favor was not "wholly without legal support" warranting judgment as a matter of law under Rule 50 or a new trial under Rule 59.

Both Saleh and his brother testified that they were subjected to near constant ridicule and insults on the basis of their race, religion, and national origin when they worked with Robinson. Among other insults, Robinson called them "dirty Arabs," "terrorists," "killers," "bin Laden," "part of al-Qaeda," told them that their "religion [was] dirty" and that they were "not supposed to come to this country," in front of customers, other employees, and Hamra himself. (Trial Tr. 43:10–44:24; 48:4–51:25; 308:14–313:25; 328:18–330:16). Saleh testified that he felt "tortur[ed]" by Robinson's racist name calling and complained to his supervisor multiple times. (Trial Tr. 45:12–13; 48:6–51:17). His brother also testified that this hostility was so severe and pervasive that it contributed to his decision to quit his job rather than continue to endure Robinson's hateful remarks. (Trial Tr. 313:6–25). Despite Pretty Girls' post-trial protestations, the Court finds that the evidence presented at trial was sufficient for the jury to find that Robinson's constant insults toward Saleh and his brother were objectively offensive and were sufficiently severe and pervasive to support a finding of liability. Even if, as Pretty Girl argues, Robinson's constant barrage of

humiliating insults was not sufficiently frequent or serious to constitute pervasive abuse, the jury could have considered the single incident on September 6, 2007 when Robinson punched Saleh after calling him "bin Laden" to be a sufficiently severe, isolated incident that would merit a verdict in Saleh's favor. *See Schiano*, 445 F.3d at 597.

Pretty Girl also argues that it has established an affirmative defense because it had an anti-harassment policy, pursuant to which Hamra disciplined Robinson and threatened him with termination if his name-calling continued, and that "there is no evidence that the remedial action taken by Hamra was not reasonably calculated to remedy the alleged harassment, or, for that matter, was ineffectual." (PG's Mem. at 24 (citing Trial Tr. 205:18–25)). However, the evidence presented at trial reflects that Pretty Girl failed to establish that Saleh ever received or was aware of the anti-harassment policy and complaint procedures; that Hamra failed to direct Saleh to report his complaints to Victor Lavy, the individual charged with receiving them under the company's policy; that Hamra failed to bring Saleh's complaints to Lavy himself; that Hamra failed to document Saleh's complaints; and that Hamra did not know of a process to report Robinson up the chain of command. (Trial Tr. 136:19–140:11; 164:21–171:8). Indeed, Hamra personally witnessed some "name-calling," but made a determination that it was not sufficiently serious to warrant significant intervention. (Trial Tr. 135:7– 138:24). Accordingly, considering the totality of the circumstances, a jury would not be compelled to find that Hamra's warning to both Robinson and Saleh to knock it off was sufficient remedial action. Further, to the extent that Pretty Girl argues that Plaintiff did not provide evidence that Hamra's stern warning was ineffectual, the Court finds that Robinson's attack on Saleh speaks for itself, and is more than sufficient to indicate that Hamra's warning did not have its intended effect of preventing further harassment.

Pretty Girl and Hamra also failed to take appropriate action after the incident on September 6, 2007. As manager of the store, Hamra failed to call the police or otherwise report Robinson's assault on his employee's behalf, and was "more concerned [about] other things." (Trial Tr. 168:16–170:13). Pretty Girl also failed to take appropriate action in the immediate aftermath of the attack, and notwithstanding the note it placed in his personnel file, permitted Robinson to continue working at a Pretty Girl store immediately after he assaulted a fellow employee. (Trial Tr. 173:15–174:24; 180:11–185:10; 512:9–514:13; 515:20–518:6; 541:6–544:12). Accordingly, Pretty Girl failed to establish an affirmative defense that it took prompt and appropriate corrective action in response to Saleh's complaints and to Robinson's clearly abusive conduct.

The Court therefore denies the Moving Defendants' motions for judgment as a matter of law or for a new trial with respect to liability for Saleh's hostile work environment claims.

V.   The Damages Awarded Were Excessive And Warrant Remittitur

The Moving Defendants raise several points to argue that the jury's damage awards were excessive. Again, because I have found that a new trial is warranted on Plaintiff's negligence and vicarious liability claims, I will only consider whether the damages awarded with respect to Plaintiff's hostile work environment claims were excessive such that remittitur or a new trial on damages is warranted.

For his hostile work environment claims, the jury found that Saleh was entitled to $100,000 in damages for emotional suffering and distress; $600,000 in punitive damages from Pretty Girl; $600,000 in punitive damages from High Styles; $25,000 in punitive damages from Hamra; and $50,000 in punitive damages from Robinson. (Special Verdict Sheet). For the following reasons, I find that remittitur is warranted.

46

A.  The Title VII Statutory Cap on Damages Does Not Directly Apply

First, Pretty Girl argues that the total $1,375,000 awarded in compensatory and punitive damages for Saleh's hostile work environment claim exceeds the statutory limits on aggregate damages imposed under Title VII and NYSHRL. (PG's Mem. at 26–27). Under the applicable statutory caps, Pretty Girl argues that Plaintiff's award is limited to $300,000. (*Id.*).

"Title VII caps compensatory and punitive damages awards based on an employer's size." *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 230–31 (E.D.N.Y. 2018) (citing 42 U.S.C. § 1981a(b)(3)). "The NYSHRL allows for and does not cap compensatory damages for employment discrimination, but it does not allow for punitive damages." *Id.* at 231 (citing N.Y. Exec. Law § 297(4)(c)(iii)); *Tse v. UBS Financial Services, Inc.*, 568 F.Supp.2d 274, 309 n.24 (S.D.N.Y. 2008) (quoting *Thoreson v. Penthouse, Int'l, Ltd.*, 80 N.Y.2d 490, 494 (1992)). Pretty Girl argues that because it had fewer than 500 employees, Plaintiff could only recover up to $200,000 from the company on his federal claims in punitive and compensatory damages. (PG's Mem. at 26). Since the NYHRL allows uncapped compensatory damages, the Court may allocate the jury's entire award can therefore be allocated at most to $100,000 in compensatory damages under the NYHRL and $200,000 in punitive damages under the federal claims, for a total recoverable amount of $300,000.

Plaintiff argues that even if Defendants had not waived this objection—which they had by failing to raise it before the jury was dismissed—since he proved a hostile work environment claim under Title VII, Section 1981, *and* the NYSHRL, he may recover under Section 1981, and the Title VII cap does not apply. (Pl's Opp. to PG at 26–27). *See also Kauffman v. Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 220 n.13 (E.D.N.Y. 2007) ("[U]nlike Title VII, Section 1981 does not have a statutory cap that limits punitive damages.") (citing 42 U.S.C. § 1981a(b)(4)); *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 77 n.11 (E.D.N.Y. 2002) ("That [plaintiff's]

retaliation claim was also pled under Title VII, which does have a cap on compensatory and punitive damages . . . is of no consequence because, as previously noted, he can recover these damages under either § 1981 or New York City Human Rights Law.")), *aff'd*, 93 F. App'x 260 (2d Cir. 2004)).

Pretty Girl responds that Saleh cannot recover under Section 1981 because he did not allege or establish evidence to support a race discrimination claim, but only offered evidence of discrimination based on his religion and national origin, which are not covered by Section 1981. (PG's Reply at 7–9). Pretty Girl's argument inexplicably sets aside case law establishing that "Arab" is a racial classification covered by Section 1981, *see Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 605 (1987) ("A person of Arabian ancestry may be protected from racial discrimination under § 1981."), that "[t]he prohibition against racial discrimination [under Section 1981] encompasses discrimination based on ancestry or ethnic characteristics," *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (citing *Al–Khazraji*, 481 U.S. at 613; *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1446–47 (9th Cir. 1997)) and that Section 1981 "provides a claim against private discrimination on the basis of alienage." *Id.* at 180.

Indeed, Pretty Girl concedes that "'Arab' is a racial classification" but argues that "Saleh did not complain of, nor prove, discrimination on the basis of being 'Arab.'" (PG's Reply at 8 n. 4). This assertion is directly contradicted by Saleh's Complaint, which clearly alleges violations of Section 1981 (Second Am. Compl. ¶¶ 1, 19, 42–47), and ignores the trial record, which is replete with evidence that Robinson's harassment included slurs regarding Saleh's Arab ethnicity, including "dirty Arab," included claims that Saleh was "not supposed to come to this country," and that he should "go back to his F'ing Arabic country," and threats that he would call immigration on Saleh. (*See, e.g.*, Trial Tr. 51:13–14; 309:2–4; 311:21–312:4; 383:12–22; 581:8–

17; 584:10). Accordingly, Pretty Girl's claim that Saleh neither pursued nor proved a Section 1981 claim is without merit.

I therefore agree with Plaintiff that the Title VII statutory cap on damages does not *per se* limit the damages available for the hostile work environment claims. However, as discussed below, the statutory cap is instructive in determining whether the jury's punitive damages award was excessive.

### B. The Compensatory Damage Award for Hostile Work Environment Claims Was Not Excessive

As noted above, the jury found that Defendants are jointly and severally liable for $100,000 in compensatory damages for Saleh's emotional suffering and distress. (Special Verdict Sheet). Pretty Girl combines this award with the jury's $100,000 awards for emotional suffering and distress in connection with his negligence and vicarious liability claims, and argues that these successive awards totaling $300,000 are duplicative and excessive. (PG's Mem. at 33–35). However, since a new trial on Plaintiff's negligence and vicarious liability claims is warranted pending Plaintiff's acceptance of the remittitur described below, I will only assess whether the jury's $100,000 compensatory damage award in connection with the hostile work environment claims was excessive.

In determining whether a jury's damage award "is so high as to shock the judicial conscience and constitute a denial of justice" such that the award should be set aside or reduced, "it is appropriate to review the awards in comparable cases." *Jennings*, 2018 WL 5630454, at *13 (internal quotation marks and citations omitted). "In assessing whether a jury award for compensatory damages is excessive, courts in the Second Circuit have routinely identified three categories of damages for emotional distress: (1) garden variety; (2) significant; and (3)

49

egregious." *Sooroojballie v. Port Auth. of New York & New Jersey*, 816 F. App'x 536, 546 (2d Cir. 2020).

Garden variety cases are characterized by less extraordinary circumstances, by more limited evidence of emotional harm—such as a plaintiff's own testimony describing "his or her injuries in vague or conclusory terms, which fails to relate the severity or consequences of the injury"—and by a lack of medical testimony corroborating plaintiff's claims. *Id.* (quoting *Maher v. All. Mortg. Banking Corp.*, No. 06-CV-05073 (DRH) (ARL), 2010 WL 3516153, at *2 (E.D.N.Y. Aug. 9, 2010) (citations omitted), *adopted by* 2010 WL 3521921 (Sept. 1, 2010). Such cases "generally merit $30,000 to $125,000 awards," *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (collecting cases) (internal quotation marks and citations omitted), but may merit higher sums, *see Quinby v. WestLB AG,* No. 04 Civ.7406 WHP, 2008 WL 3826695, at *1 (S.D.N.Y. Aug. 15, 2008) (remitting $500,000 compensatory damage award to $300,000 in garden variety case, and noting that the remitted amount was "at or above the upper range of reasonableness.").

"Significant emotional distress claims are based on more substantial harm or offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses." *Maher*, 2010 WL 3516153, at *2; *see also Menghi v. Hart,* 745 F. Supp. 2d 89, 107 (E.D.N.Y. 2010) ("A claim for emotional distress goes beyond 'garden variety' where the plaintiff suffers physical consequences of the emotional harm."), *aff'd*, 478 F. App'x 716 (2d Cir. 2012). "In cases with 'significant' emotional distress claims, awards 'usually range from $50,000.00 to $200,000.00,' but 'courts have, in some instances, upheld awards exceeding $200,000.00.'" *Sooroojballie*, 816 F. App'x at 547 (quoting *Emamian v. Rockefeller Univ.*, No. 07 Civ. 3919 (DAB), 2018 WL 2849700, at *16, *18 (S.D.N.Y. June 8, 2018)).

"Egregious emotional distress claims yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff." *Maher*, 2010 WL 3516153, at *2; *see also Lore*, 670 F.3d at 178 ("For truly egregious conduct with severe and verified results on a complainant's mental and physical health, courts have upheld awards far in excess of the amounts upheld here.") (citations omitted).

The evidence presented at trial case demonstrates "garden variety" or "significant" emotional distress claims. Plaintiff, his brother, and his step-mother—who has a master's degree and professional training in counseling—testified that Robinson's harassment and assault caused Saleh emotional distress which led to weight loss; to his withdrawing from social events and family activities; to trouble sleeping and bad dreams; to increased impatience, sadness, nervousness, and anxiety; and to an irrational fear of Black people. (Trial Tr. 73:2–14; 74:25–75:11; 316:3–320:15; 389:9–392:16; 401:15–403:18; 405:3–6; 413:3–10). Further, although Plaintiff did not present testimony from a medical professional to corroborate his emotional distress, he testified that he saw a psychiatrist in Yemen to seek mental health treatment. (Trial Tr. 100:7–12). And while Defendants' expert in psychiatry, Dr. Robert Cancro, testified that Saleh expressed anger and resentment at the injustice of his injuries but showed no signs of clinical depression, post-traumatic stress disorder (PTSD), or other diagnosable mental illness when examined in April 2010, he suggested on cross-examination that an individual in Saleh's shoes who underwent similar circumstances could have developed PTSD as it is defined by the DSM-5. (Trial Tr. 578:21–22; 579:1–25; 588:2–590:22; 611:19; 614:15–615:19). Because Plaintiff has presented his own testimony and the testimony of corroborating witnesses regarding his emotional distress and its physical manifestations, and has indicated that he has received some medical treatment in connection with his emotional distress, but did not proffer testimony from an independent

51

healthcare professional, I find that this case is most comparable to higher end "garden variety" or to the mid-range of "significant" emotional distress cases.

Accordingly, the $100,000 damages awarded here is within the range of reasonableness for comparable cases. *See, e.g.*, *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress.' . . . [W]e [have previously] rejected [a] defendant's contention that those damage awards, for 'garden variety emotional distress claims,' 'should have been reduced to between $5,000 and $30,000.'") (citations omitted); *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006) (upholding the jury's $100,000 compensatory damages award where "the plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains"); *Phillips v. Bowen*, 278 F.3d 103, 111–12 (2d Cir. 2002) ($400,000 award not excessive where plaintiff, boyfriend, and co-workers testified to her emotional distress, physical illness, and effects on her lifestyle and relationships); *Quinby,* 2008 WL 3826695, at *4 (remitting $500,000 compensatory damage award to $300,000 in garden variety case, and noting that the remitted amount was "at or above the upper range of reasonableness."). Therefore, I do not find the jury's $100,000 compensatory award to be excessive.

C.  Excessive Punitive Damages for Hostile Work Environment Claims

In addition to compensatory damages for emotional distress, for which the defendants are joint and severally liable, the jury awarded Saleh independent punitive damage awards from each defendant: $600,000 from Pretty Girl; $600,000 from High Styles; $25,000 from Hamra; and

$50,000 from Robinson. (Special Verdict Sheet).[12] The Moving Defendants argue that these punitive damages are unsupported by the record, were duplicative because they were assessed against both Pretty Girl and High Styles, and were unconstitutionally excessive. (PG's Mem. at 24–26, 30–31, 32–33; HS & H Mem. at 14–16, 20–21).

### 1. The Jury Properly Found that Punitive Damages are Warranted

First, Pretty Girl argues that the jury was not presented with sufficient evidence of Pretty Girl's malicious conduct or reckless indifference to Saleh's rights such that punitive damages were permissible. (PG's Mem. at 30–31). Specifically, Pretty Girl argues that punitive damages should not have been imposed here because it maintained and distributed an anti-discrimination policy, because the misconduct was limited to only one individual employee over a short period of time, because Hamra directly confronted Robinson about his behavior, and because Hamra's belief that Robinson and Saleh were engaged in mutual teasing and joking around, "even if mistaken, was not egregious or outrageous." (PG's Mem. at 30).

"Punitive damages are 'a discretionary moral judgment that the defendant has engaged in conduct that is so reprehensible that it warrants punishment.'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015) (quoting *Tolbert*, 242 F.3d at 77)); *see also Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)) (noting that "the purpose of punitive damages" is "to punish the defendant and to deter him and others from similar conduct in the future."). Such damages are recoverable under either Title VII or Section 1981, *see Hill*, 212 F. Supp. at 74, and are "appropriate only 'when the defendant's conduct

---

[12] Because the NYHRL does not allow for punitive damages, *United Health Programs of Am., Inc.*, 350 F. Supp. 3d at 231 (citing N.Y. Exec. Law § 297(4)(c)(iii); *Tse*, 568 F.Supp.2d at 309 n.24 (S.D.N.Y. 2008)), and because a new trial is warranted on Saleh's other state law claims, the Court need not consider whether there was error in failing to instruct the jury that "'clear and convincing evidence' was required to impose punitive damages with respect to Saleh's state law claims." (PG's Mem. at 31–32).

is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Wiercinski*, 787 F.3d at 115 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). "A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005).

Throughout trial, Plaintiff offered proof sufficient for the jury to find that Robinson acted with discriminatory intent and that the Moving Defendants were recklessly indifferent to Saleh's federally protected rights. Despite Robinson's constant name-calling and harassment, Hamra gave only occasional, tepid warnings to both Robinson and Saleh to cut it out or risk termination. (Trial Tr. 198:3–199:9; 205:15–25). Hamra also failed to consult with Lavy or direct Saleh to do so, as contemplated by Pretty Girl's anti-discrimination policy, and testified that he was never trained on implementing the policy or on writing-up an employee for harassing others. (Trial Tr. 118:7–120:3; 130:1–132:21; 155:6–15; 229:21–25). Perhaps most importantly, Hamra failed to call the police in the wake of Robinson's assault, and testified that he was "more concerned [about] other things." (Trial Tr. 168:16–170:13). Lavy, the individual charged with receiving complaints of harassment, indicated that he, too, had no training on implementing workplace policies prohibiting harassment, minimized Robinson's behavior by noting that "bin Laden" is "not a bad name, it's a name," failed to communicate the attack to other store managers to prevent Robinson from transferring to another Pretty Girl store, and failed to terminate Robinson after learning that he was working at another store. (Trial Tr: 506:2–12; 522:23–523:8; 544:4–546:10; 547:13–25; 554:17–557:15). The corporations' complete failure to train Hamra or Lavy on taking appropriate action

54

in response to discrimination, the managers' failure to take appropriate action before and after the assault, and their continued minimization through trial of Robinson's harassment demonstrate reckless indifference for Saleh's rights sufficient for the jury to find that punitive damages were warranted.

### 2.   The Punitive Damages Awarded Were Not Duplicative

Next, Pretty Girl and High Styles argue that the jury's imposition of punitive damages against both entities was improperly duplicative. (PG's Mem. at 24–26; HS & H Mem. at 15–16). In particular, High Styles argues that Saleh was employed by Pretty Girl, rather than High Styles, that he was not employed by both corporate defendants, and that it was therefore "improper for the jury to award punitive damages to Plaintiff as against both Corporate Defendants." (HS & H Mem. at 15). Further, they argue that even if High Styles "were a proper party, and considered to be a joint employer, then the jury was certainly 'double-dipping' by awarding punitive damages to Plaintiff as against both Corporate Defendants." (HS & H Mem. at 15). Pretty Girl no longer disputes that it was Saleh's employer, but argues that "[a]llowing the jury to asses [sic] punitive damages against Pretty Girl and High Style [sic] separately, when the Court found 'there was no question, absolutely not, that there is a single employer here,' was plain error," and requires that the punitive damages award be set aside. (PG's Mem. at 24–25 (citing Trial Tr. 563:17–18)). Specifically, Pretty Girl argues that the Court's failure to instruct the jury that Pretty Girl and High Styles were a single employer, and its listing the two entities separately on the verdict sheet "invit[ed] the jury to impose punitive damages twice against what was determined to be the same corporate entity." (PG's Mem. at 25).

"Entities that are not direct employers of an individual may still be liable for discrimination . . . under the single employer or joint employer theories." *Pottash v. Hello Living,*

*LLC,* No. 19-CV-4530 (RPK) (SJB), 2021 WL 375341, at *3 (E.D.N.Y. Feb. 2, 2021). Under the single employer theory, "an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger 'single-employer' entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer." *Id.* at *4 (quoting *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (internal quotation marks omitted)). "Whether two entities constitute a 'single employer' is determined by four factors enumerated by the Supreme Court: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Trs. of the Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 334 (E.D.N.Y. 2017) (citing *Radio & Television Broad. Technicians Loc. Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965)). "Although no one factor is determinative, and indeed, all four factors are not required, control of labor relations is the central concern." *Murray v. Miner*, 74 F.3d 402, 404–05 (2d Cir. 1996). Under the joint employer theory, "there is no single integrated enterprise," but "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment on the constructive employer." *Pottash*, 2021 WL 375341 at *4 (quoting *Arculeo*, 425 F.3d at 193). "[F]actors courts have used to examine whether an entity constitutes a joint employer of an individual include 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision.'" *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) (citing *St. Jean v. Orient–Express Hotels Inc.*, 963 F.Supp.2d 301, 308 (S.D.N.Y. 2013)).

Despite Saleh's testimony that he had never heard of High Styles (Trial Tr. 37:18–19), High Styles' argument that it is an improper party to this suit and that was not Saleh's employer at the time of the incident is invalidated by the stipulated facts presented to the jury that Saleh and Robinson were employees at the High Styles store where the incident occurred, and that Hamra was an "employee, manager, supervisor, and decisionmaker [with] authority to discipline, supervise, hire, and terminate employees present at High Styles. " (Trial Tr. 29:18–30:10; *see also* Joint Pre-Trial Order). Further, the jury was presented with abundant evidence regarding the relationship between Pretty Girl and High Styles sufficient to find that either a single employer or a joint employer theory of liability applied: Saleh, his brother, and Hamra all understood that they worked for Pretty Girl; both Saleh and Hamra transferred among Pretty Girl locations; witnesses explained that Pretty Girl's written anti-discrimination policies applied to employees at the High Styles store; notations were made in Pretty Girl's corporate records relating to the incident at High Styles; applicants to the store were filtered through Pretty Girl's corporate headquarters; and Lavy, a Pretty Girl employee and vice president, was responsible supervising and managing High Styles and other stores, with the ability to hire, fire, and discipline employees. Accordingly, the jury properly found that High Styles and Pretty Girl operated as a single, integrated employer, and were *both* liable for violations of employment law despite Saleh's nominal employment by High Styles.

Pretty Girl asserts that the Court made this finding, rather than the jury, and that it was plain error not to instruct the jury that there was a single employer here. That is not the case; rather, the Court explicitly reserved decision on the issue and sent the question of whether High Styles and Pretty Girl operated as a single employer to the jury (Trial Tr. 559:24–564:19), and properly instructed the jury on the applicable law as described above (Trial Tr. 668:24–669:19). Indeed, Defendants opposed Plaintiff's motion for judgment as a matter of law on the issue at trial,

essentially arguing that such an instruction would have been inappropriate. (Trial Tr. 561:20–562:10). Therefore, even if Defendants had not waived their objection to the lack of a dispositive single employer instruction by failing to raise the objection before the case was submitted to the jury, *Jarvis*, 283 F.3d at 56–57, the Court will not find fundamental error in failing to give such an instruction.

Moreover, while the jury's finding of a joint and single employer here permitted liability as to Pretty Girl despite Saleh's nominal employment by High Styles, it did not entirely extinguish the distinction between the two entities. "Punitive damages . . . serve to punish a particular defendant," and while "compensatory damages are not calculated defendant-by-defendant, . . . punitive damages are." *Magalios v. Peralta*, No. 19 Civ. 6188 (CS), 2022 WL 407403, at *5 (S.D.N.Y. Feb. 10, 2022); *see also Rodick*, 1 F.3d at 1349 (noting that joint and several liability does not apply to punitive damages). Indeed, the jury was specifically instructed that "there are four defendants in this case," and was told that it "must make the decision to award punitive damages and, if so, the amount to be awarded as to each individual defendant separately. In this regard, there is no joint responsibility." (Trial Tr. 681:18–22).[13] While Pretty Girl and High Styles acted jointly in violating Saleh's rights, they are separate entities and can be punished separately. Since punitive damages are assessed individually, the Court finds no error in instructing the jury accordingly or in permitting the jury to enter separate punitive damage awards against High Styles and Pretty Girl on the verdict sheet.

### 3. The Punitive Damages Awarded Were Excessive

Finally, the Moving Defendants argue that the jury's punitive damage awards are unconstitutionally excessive and violate due process, such that they should be eliminated or

---

[13] Pretty Girl and High Styles also raised no objections to this instruction before the case was submitted to the jury and have not raised specific objections to this particular instruction in their post-trial motions.

reduced. (PG's Mem. at 5, 32–33; HS & H Mem. at 20–21). "To determine whether a punitive damage award violates due process, courts must consider (1) the reprehensibility of the Defendant's conduct, (2) the disparity between the punitive damages award and the harm or potential harm suffered by plaintiff, and (3) the 'difference between this remedy and the civil penalties authorized or imposed in comparable cases.'" *Bauta v. Greyhound Lines, Inc.*, No. 14-CV-3725 (RER), 2019 WL 8060183, at *11 (E.D.N.Y. Jan. 4, 2019) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

a. Degree of Reprehensibility

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (quoting *Gore*, 517 U.S. at 575)). In assessing this first consideration, courts look to certain "'aggravating factors' that are 'associated with particularly reprehensible conduct,'" which include "(1) whether a defendants conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee*, 101 F.3d at 809 (quoting *Gore*, 517 U.S. at 576). Courts also consider whether "the harm caused was physical as opposed to economic" and whether "the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others." *Campbell*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77).

The evidence presented at trial supports a finding that the Defendants' conduct was reprehensible, as it was repeated, reckless and culminated in violence and physical injury. Robinson continually subjected Saleh to harassment at the workplace because of his race, his religion, and his country of origin, and the managers responsible for preventing or correcting that

conduct failed to respond appropriately. In addition to the psychic damage that this caused, Robinson's unaddressed harassment culminated in a violent attack requiring hospitalization and surgery. Yet the employers' inaction continued, as Hamra failed to call the police or an ambulance and Pretty Girl allowed Robinson to continue working at another store the following week. Considering the repeated harassment, the violent apex, and the continued indifference of Pretty Girl and High Styles, the first *Gore* factor militates in favor of punitive damages.

b.Proportionality to Compensatory Damages

Although there is no "bright-line ratio which a punitive damages award cannot exceed," the Supreme Court has indicated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 424–25; *see also Johnson v. Nextel Commc'ns Inc.,* 780 F.3d 128, 149 (2d Cir. 2015) ("[T]here is no rigid upper limit on a ratio of punitive damages to compensatory damages."). While there is no maximum, a four-to-one ratio of punitive to compensatory damages is generally considered to be "close to the line of constitutional impropriety." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014) (quoting *Campbell*, 538 U.S. at 425); *see also Thomas v. iStar Fin., Inc.,* 652 F.3d 141, 149 (2d Cir. 2011); *Anderson v. Aparicio*, 25 F. Supp. 3d 303, 311 (E.D.N.Y. 2014), *aff'd and remanded sub nom. Anderson v. Cty. of Suffolk*, 621 F. App'x 54 (2d Cir. 2015). Overall, it is important to consider whether the award is "proportionate to the harm considering that compensatory damages may already contain a 'punitive element.'" *Tellado*, 2018 WL 4043150, at *8 (citing *Campbell*, 538 U.S. at 426).

Notably, "there is an absence of explicit direction from the Second Circuit as to how courts should properly compute such ratios where, as here, defendants are jointly and severally liable for compensatory damages but individually liable for separate amounts of punitive damages."

*Magalios*, 2022 WL 407403, at \*5. Courts therefore vary in their approach to comparing damages in such cases, with some weighing the total punitive damages against the total compensatory damages, *see id.* (citing *Jennings v. Yurkiw*, 18 F.4th 383, 391–92 (2d Cir. 2021); *Anderson v. Osborne*, No. 17-CV-539, 2020 WL 6151249, at \*8 (S.D.N.Y. Oct. 20, 2020));[14] some weighing the individual punitive awards against individual pro rata shares of actual damages; *see id.* (citing *Alla v. Verkay*, 979 F. Supp. 2d 349, 374 (E.D.N.Y. 2013);[15] and some weighing each defendant's punitive damages against the total amount of actual damages, *see id.* (citing *Bouveng v. Nyg Capital LLC*, 175 F. Supp. 3d 280, 347 (S.D.N.Y. 2016).[16]

Because compensatory damages are assessed on a joint-and-several basis while punitive damages are assessed individually and with an intent to punish and deter a particular defendant, it is "counterintuitive to prorate the collective compensatory damages amount and compare that to an individual punitive damages amount, or to disregard the individual nature of punitive damages." *Id.* It is therefore appropriate to compare the individual punitive awards against the total compensatory award, for ratios of 6:1, 6:1, 1:4, and 1:2 as applied to Pretty Girl, High Styles, Hamra, and Robinson, respectively. While the ratios that apply to Pretty Girl's and High Styles' awards are properly considered to be the single digits, they nevertheless are above the 4:1

---

[14] Here, $1,275,000 in punitive damages and $100,000 in compensatory damages, for an overall ratio of 12.75:1. (*See* Special Verdict Sheet).

[15] Here, $600,000 in punitive damages and $25,000 in compensatory as applied to Pretty Girl and High Styles, for a 24:1 ratio; $25,000 in punitive damages and $25,000 in compensatory damages as applied to Hamra, for a 1:1 ratio, and $50,000 in punitive damages and $25,000 in compensatory as applied to Robinson, for a 2:1 ratio. (*See* Special Verdict Sheet).

[16] Here, $600,000 in punitive damages and $100,000 in compensatory damages as applied to Pretty Girl and High Styles, for a 6:1 ratio; $25,000 in punitive damages and $100,000 in compensatory damages as applied to Hamra, for a 1:4 ratio; and $50,000 in punitive damages and $100,000 in compensatory damages as applied to Robinson, for a 1:2 ratio. (*See* Special Verdict Sheet).

boundaries to which courts in this Circuit typically circumscribe punitive damages awards. Accordingly, the second *Gore* factor militates toward reducing those two awards.

### c. Comparable Civil Penalties

"The third and final guidepost of punitive damage excessiveness is 'comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct,' which indicates deference to 'legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Kauffman*, 509 F. Supp. 2d at 219 (quoting *Gore*, 517 U.S. at 574–75, 583). "[T]he Supreme Court has instructed courts to consider analogous statutory restrictions in determining the constitutionality of a punitive damages award." *Id.* at 220 (citing *Gore,* 517 U.S. at 583–85). As noted above, while there are no limits on recovery in Section 1981 cases, compensatory and punitive damages are capped at $300,000 in Title VII cases, and punitive damages are not permitted under NYSHRL. *United Health Programs of Am., Inc.*, 350 F. Supp. 3d at 230–32. Further, even in cases where, as here, a plaintiff recovers his punitive damages under Section 1981, courts "take the Title VII cap into account" when assessing whether the damages awarded are excessive. *Kauffman*, 509 F. Supp. 2d at 220–21; *see also MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 568 (S.D.N.Y. 2012).

However, while the statutory caps are taken into consideration, they do not prohibit punitive damage recoveries that are greater than $300,000. *See Kauffman*, 509 F. Supp. 2d at 220–21 (quoting *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798 (8th Cir. 2004)) (noting that Title VII cap does not create "a per se rule that in § 1981 actions awards in excess of $300,000 violate due process," and ordering conditional remittitur of punitive damage award from $1,500,000 to $551,470 after considering the cap); *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739 (KMW), 2005 WL 2170659, at *19 (S.D.N.Y. Sept. 6, 2005) (recognizing Title VII and state law restrictions on

punitive damages, but nevertheless awarding $717,000 in punitive damages as appropriate and permissible under alternative means of recovery), *aff'd*, 225 F. App'x 3 (2d Cir. 2006). Accordingly, while Saleh's recovery is not *per se* limited to $300,000 by the Title VII and NYSHRL restrictions on punitive damages, those statutory restrictions are nevertheless an important consideration, and weigh in favor of reducing the punitive damage awards here.

Given the reprehensible nature of the conduct underlying Plaintiff's claims, the proportional size of the compensatory damages award to the individual punitive damages awards, and the existence of statutory caps reflecting legislative judgments on the appropriate sanctions under similar circumstances, the Court concludes that remittitur is appropriate here.

Accordingly, the punitive damages award is conditionally remitted to $200,000 as against Pretty Girl and $200,000 as against High Styles.[17] This remittitur takes into account the relative reprehensibility of the corporate defendants' actions, reduces their individual punitive damage ratios from 6:1 to 2:1 (and reduces the aggregate ratio from 12:1 to 4:1), and properly takes into account legislative judgments with respect to the appropriate sanctions for discrimination claims such as these. "If Plaintiff does not accept the remittitur, the Court shall vacate the punitive damages award and conduct a new trial limited to the question of damages." *Kauffman*, 509 F. Supp. 2d at 221 (citing *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)).

VI.   <u>Plaintiff's Attorneys' Fees and Costs</u>

Because Saleh has prevailed on his federal discrimination claims,[18] the Court next examines his request for an award of $213,362.25 in attorneys' fees and $11,728.80 in costs through June

---

[17] For the avoidance of doubt, the punitive damages awards as against Hamra and Robinson are not remitted. As to the individual defendants, the Court finds that the jury's awards were proportional to the compensatory damages awarded, to the reprehensibility of the behavior at issue, and to legislative sanctions for similar conduct, and were therefore properly calculated to punish the individual defendants for their actions.

[18] Plaintiff has not prevailed on his state negligence and vicarious liability claims, and even successful state claims would not, standing alone, be compensable under the fee shifting statute. Nevertheless, because his "state-law claims

2014 pursuant to 42 U.S.C. § 1988 and Local Rule 54.1. (Pl's Fee App.). In support of the application, Plaintiff submits a declaration from his counsel (*see* Declaration attached to ECF No. 97 ("Brewington Decl."), a memorandum of law in support of the application (ECF No. 97-8), and contemporaneous billing records. (ECF No. 97-1 ("Billing Records")). Defendants oppose the fee application, arguing that a 40% across-the-board reduction in attorneys' billing rates and costs is warranted to account for more appropriate prevailing rates, questionable billing entries, and superfluous costs. (Def's Opp. to Fee App. ¶¶ 15–27).

"[T]o determine a reasonable attorney's fee, a court must calculate a 'lodestar figure,' which is determined by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate." *Monette v. Cty. of Nassau*, No. 11-CV-539 (JFB) (AKT), 2016 WL 4145798, at *2 (E.D.N.Y. Aug. 4, 2016) (citing *Hensley*, 461 U.S. at 433; *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997)). "Both [the Second Circuit] and the Supreme Court have held that the lodestar method . . . creates a 'presumptively reasonable fee.'" *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2007)). The lodestar method "includes most, if not all, of the relevant factors constituting a reasonable attorney's fee," and "produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S.

---

were based on the same events giving rise to [his] federal claims," and because his counsel's time is not easily divisible on a claim-by-claim basis, the Court considers his attorneys' contributions to the litigation as a whole. *Stanczyk v. City of New York*, 990 F. Supp. 2d 242, 251 (E.D.N.Y. 2013), *aff'd*, 752 F.3d 273 (2d Cir. 2014); *see also Hensley*, 431 U.S. at 435 (noting where "plaintiff's claims for relief . . . involve a common core of facts or [are] based on related legal theories[,] [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," and in such cases "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."); *Crews*, 2019 WL 6894469, at *6 (quoting *Murphy v. Lynn*, 118 F.3d 938, 952 (2d Cir. 1997)) ("[A] 'plaintiff's lack of success on some of his claims does not require the court to reduce the lodestar amount where the successful and the unsuccessful claims were interrelated and required essentially the same proof.'").

at 551, 553 (internal quotation marks and citations omitted). "The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (citing *Hensley*, 461 U.S. at 433)). Accordingly, "[a]pplications for fee awards must be documented by time records which specify the date, time expended, hourly rate, and description of the work done by each attorney." *Miller v. E. Midwood Hebrew Day Sch.*, No. 19-CV-5580 (AMD)(LB), 2021 WL 966166, at *8 (E.D.N.Y. Feb. 15, 2021) (citing *Hensley*, 461 U.S. at 433; *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983)), *adopted by* 2021 WL 965072 (E.D.N.Y. Mar. 15, 2021).

For the reasons explained below, the Court agrees that some adjustments are warranted, and awards Plaintiff attorneys' fees in the amount of $157,332.50.

A.  Reasonable Hourly Rate

Plaintiff's counsel seeks the following hourly rates: $500 for Frederick K. Brewington; $375 for Arshad Majid; $315 for Gregory Calliste, Jr.; $275 for Maria C. John; $250 for G. William Germano; and $150 for Precilla Lockett. (Brewington Decl. ¶ 49). Defendants argue that these hourly rates are excessive. (Def's Opp. to Fee App. at 3–4).

"To determine reasonable hourly rates, the Court considers this Circuit's adherence to the forum rule, which states that a district court should generally use the prevailing hourly rates in the district where it sits." *Tenecora v. Ba-kal Rest. Corp.*, No. 18-CV-7311 (DRH) (AKT), 2020 WL 8771256, at *28 (E.D.N.Y. Nov. 30, 2020), *adopted in part by* 2021 WL 424364 (Feb. 8, 2021). "The rates used by the court should be 'current rather than historic hourly rates," *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006) (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998)), "in order to compensate for the delay in payment." *A.R. ex rel.*

*R.V. v. New York City Dep't of Educ.*, 407 F.3d 65, 83 (2d Cir. 2005) (quoting *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 764 (2d Cir. 1998)).

In recent years, "[c]ourts in this District have concluded that $200 to $450 per hour is a reasonable hourly rate for partners, $200 to $325 per hour is reasonable for senior associates, and $100 to $200 per hour is reasonable for more junior associates." *Crews*, 2019 WL 6894469 at *7 (collecting cases); *see also Johnson v. City of New York,* No. 11-CV-06176 (ENV) (CLP), 2016 WL 590457, at *5 (E.D.N.Y. Feb. 11, 2016) ("As benchmarks, judges of this Court have awarded between $300 and $450 for partners in large law firms and for attorneys with extensive experience with the particular issues of a case; between $200 and $325 for senior associates and for attorneys with limited experience with the particular issues involved in the subject case; and $100-$200 for junior associates, or attorneys with little or no experience with the particular issues."); *Miller*, 2021 WL 966166, at *9 (collecting similar prevailing rates); *Tenecora*, 2020 WL 8771256, at *28 (collecting cases and noting that while prevailing rate for experienced attorneys is $300 to $400 per hour, some courts award higher range of $300 to $450 for partners in large law firms and attorneys with extensive experience with particular issues of the case); *Reiter v. Maxi-Aids, Inc.,* 14 CV 3712 (SJF) (GRB), 2019 WL 1641306, at *4 (E.D.N.Y. Apr. 16, 2019) (noting that courts award up to $450 per hour for partners and up to $325 for associates in fee-shifting cases); *Anderson*, 2016 WL 1444594, at *4 (quoting *D'Annunzio v. Ayken, Inc*., No. 11–CV–3303 (WFK) (SIL), 2015 WL 5308094, at *4 (E.D.N.Y. Sept. 10, 2015)) ("In recent years, '[c]ourts in the Eastern District of New York award hourly rates ranging from $200 to $450 per hour for partners, $100 to $300 per hour for associates, and $70 to $100 per hour for paralegals.'"); *Monette*, 2016 WL 4145798, at *3 (collecting same prevailing rates).

In addition to considering the prevailing rates within the district, the Second Circuit instructs courts to consider additional factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989) to determine a reasonable hourly rate. *Crews v. Cty. of Nassau*, No. 06-CV-2610 (JFB) (GRB), 2019 WL 6894469, at *6 (E.D.N.Y. Dec. 18, 2019) (citing *Arbor Hill*, 522 F.3d at 190).[19]

1.   Mr. Brewington

Mr. Brewington is a highly experienced civil rights attorney who has been practicing law since 1986, and has been engaged in his own legal practice, the Law Offices of Frederick K. Brewington ("the Brewington Firm"), since 1987. (Brewington Decl. ¶¶ 10–13). He is an active participant in the local community and is well-respected in the Eastern District. (*Id.* ¶ 12–25). Commensurate with his experience, Mr. Brewington typically bills at a rate of $500 per hour. (*Id.* ¶ 16). While "that rate 'is persuasive evidence of reasonableness, compensable attorneys' fees must ultimately conform to market rates." *Crews*, 2019 WL 6894469, at *10 (quoting *Tatum v. City of New York*, No. 06 Civ. 4290 (PGG) (GWG), 2010 WL 334975, at *5 (S.D.N.Y. Jan. 28, 2010). Defendants argue that a 40% reduction of that hourly rate would fairly compensate Mr. Brewington for his time, and would be consistent with the lower end of this District's prevailing range. (Def's Opp. to Fee App. ¶¶ 13–15). However, given his significant experience in litigating civil rights cases, this Court's own observations of Mr. Brewington's performance over the course of the litigation, and the Court's assessment of the other *Arbor Hill* factors, I find that an hourly rate at the higher end of the prevailing reasonable rate is warranted.

---

[19] The *Arbor Hill* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Arbor Hill*, 522 F.3d at 186 n.3 (quoting *Johnson*, 488 F.2d at 717).

Accordingly, a rate of $450 per hour is appropriate under the circumstances. *See Hugee*, 852 F. Supp. 2d at 300 ("The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields." (citing *Luca*, 698 F. Supp. 2d at 301) (awarding Mr. Brewington $400 per hour in 2010)); *see also Crews*, 2019 WL 6894469, at *10 (under similar circumstances awarding Mr. Brewington a reduced rate of $450 per hour); *Anderson*, 2016 WL 1444594, at *4 (same).

2. Mr. Majid

As of the time of the fee application, Mr. Majid had fourteen years of legal experience, and served as Senior Litigation Counsel and principal attorney at his own law practice, Majid & Associates, P.C., representing clients in a variety of criminal and civil actions, including criminal, family, and civil rights matters, commercial and residential real estate transactions, bankruptcies, and foreclosures. (Brewington Decl. ¶¶ 30–31; ECF No. 97-7 ("Masjid CV")). He has been practicing law since 1999, and worked as an Assistant District Attorney in Suffolk County for three years before entering private practice. (Masjid CV). Mr. Masjid became involved in this matter soon after the incident in September 2007, and served as counsel to Saleh before referring the matter to the Brewington Firm. (Brewington Decl. ¶ 29). In these early stages, Mr. Majid communicated with law enforcement with respect to Robinson's assault and handled the administrative EEOC proceedings prior to filing in federal court. (*Id.* at ¶ 29). Mr. Masjid's skills in Arabic were reportedly essential in explaining the legal process and other issues to Mr. Saleh. (Brewington Decl. ¶ 33). In connection with this representation, Mr. Masjid requests an hourly rate of $375.(*Id.* ¶ 34). Defendants propose a 40% cut to Mr. Masjid's rate, yielding an hourly rate

of $225. (Def's Opp. to Fee App. ¶ 16).[20] Given Mr. Majid's lack of significant civil rights litigation experience, that rate—which is near the higher end of the range of prevailing rates—I agree that a $375 hourly rate is inappropriate. *See Crews*, 2019 WL 6894469, at *8 (reducing Mr. Majid's rate to $250 per hour in civil rights case, due in part to his lack of experience in such cases).

Given the prevailing hourly rates in this District, the time and effort Mr. Masjid devoted to the early stages of the case, Mr. Masjid's lack of experience in civil rights cases, and the rates assigned to Mr. Masjid in another recent case in this District, and after considering the other *Arbor Hill* factors, the Court finds that $300 per hour is a reasonable rate for Mr. Majid.

### 3. Mr. Calliste

At the time of the fee application, Mr. Calliste was a senior associate at the Brewington Firm, having been with the firm for approximately ten years. (Brewington Decl. ¶ 35). In this case, he prepared for and conducted two depositions. (*Id.*) Mr. Brewington indicates that Mr. Calliste's ten years of significant experience in litigating civil rights cases with the firm merits a $315 hourly rate. (*Id.* ¶¶ 36–37). Defendants propose a 40% cut, yielding a rate of $189 per hour. (Def's Opp. to Fee App. ¶ 16). Considering Mr. Calliste's seniority at the Brewington Firm and ten years of legal experience, as well as the time, labor, and skill required to conduct the depositions, and the other relevant *Arbor Hill* factors, the Court finds that $250 is an appropriate hourly rate for Mr. Calliste.

---

[20] Although as an independent attorney Mr. Masjid is not technically covered by Defendants' requested categorical 40% reduction which would apply "to all attorneys working in [Mr. Brewington's] office,"(Def's Opp. to Fee App. ¶ 16), the Court infers that Defendants seek the same reduction for Mr. Masjid's fees as well based on their proposed reduced total (*Id.* ¶ 17).

69

### 4. Ms. John

Ms. John worked closely with the Brewington Firm in this matter on an of counsel basis, bringing twelve years of experience focused on complex commercial disputes, insurance coverage cases, and non-profit tax exemption and real estate disputes. (Brewington Decl. ¶¶ 41–42). She served as second chair, and played a key role in preparing for and conducting the trial on Plaintiff's behalf. (*Id.* ¶ 44). She requests a rate of $275 per hour. (*Id.* ¶ 45). Defendants contend that a $165 hourly rate is more appropriate. (Def's Opp. To Fee App. ¶ 16). Like Mr. Masjid, Ms. John is affiliated more loosely with the Brewington Firm and lacks significant civil rights experience. However, Ms. John brings significant trial experience in litigating complex matters, and unlike Mr. Masjid, does not request a rate at the upper end of the prevailing range. Based on the time and labor expended in this case, Ms. John's experience, and this Court's observations, as well as an assessment of the other *Arbor Hill* factors, I find the requested $275 rate to be reasonable.

### 5. Mr. Germano

As of the filing of the fee application, Mr. Germano was a sixth-year associate at the Brewington Firm. (Brewington Decl. ¶ 38). Mr. Germano devoted significant time and efforts to the pre-trial stages of Plaintiff's case in addition to assisting during trial. (*Id.* ¶ 40; *see also* Billing Records). Mr. Germano requests a rate of $250 per hour. (*Id.* ¶ 40). Defendants argue that a $150 hourly rate would be reasonable. (Def's Opp. to Fee App. ¶ 16). Based on his seniority at the Brewington firm and the considerable time and labor expended in pre-trial matters, among other *Arbor Hill* factors, the Court finds that $200 per hour is an appropriate rate.

### 6. Ms. Lockett

Ms. Lockett is the Managing Attorney at the Brewington Firm. (Brewington Decl. ¶ 47). In addition to preparing for and researching issues in the case, Ms. Lockett made administrative

contributions to the case by "organizing exhibits to be provided to the Court, coordinating the work being done by other legal staff, and orchestrating duties of office staff members." (*Id.* ¶¶ 46–47). She requests a rate of $150 per hour. (*Id.* ¶ 48). Defendants argue that a $90 hourly rate is more appropriate. (Def's Opp. to Fee App. ¶ 16). Another court in this District recently reduced Ms. Lockett's rate substantially after finding that she exclusively performed non-legal work. *See Anderson*, 2016 WL 1444594, at *5 (reducing Ms. Lockett's rate to "$75.00 per hour, the typical rate for paralegals in this District" after reviewing time records and finding that performed non-legal work). However, the Court's review of contemporaneous time records indicates that Ms. Lockett performed both legal and non-legal work. (*See* Billing Records at 23–24 (entries regarding drafting Plaintiff's submissions for joint pre-trial order); *id.* at 21–28 (entries regarding correspondence with client, opposing counsel, witnesses, and the Court regarding scheduling). Based on the mix of legal and non-legal work performed by Ms. Lockett in this case, her overall role at the Brewington Firm, and her years of experience as an attorney, the Court finds that a rate at the higher end of the prevailing range for a paralegal is more appropriate. Accordingly, the Court will apply a rate of $100 per hour to Ms. Lockett's work in performing the lodestar calculation.

## B. Hours Reasonably Expended

"The party seeking attorney's fees also bears the burden of establishing that the number of hours for which compensation is sought is reasonable." *Crews*, 2019 WL 6894469, at *7 (quoting *Custodio v. Am. Chain Link & Constr., Inc.,* No. 06 Civ. 7148 (GBD) (HBP), 2014 WL 116147, at *9 (S.D.N.Y. Jan. 13, 2014)). "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch*, 148 F.3d at 173; *see also Luca v. Cnty. of Nassau,* 698 F. Supp. 2d 296, 301 (E.D.N.Y. 2010) ("A fee applicant bears the burden of

demonstrating the hours expended and the nature of the work performed."). "Hours that are 'excessive, redundant, or otherwise unnecessary,' are to be excluded, and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Id.* (quoting *Hensley*, 461 U.S. at 434; *Carey*, 711 F.2d at 1146); *see also Monette*, 2016 WL 4145798, at *9 (collecting cases and applying 20% across-the-board reduction in counsel's hours due to, *inter alia*, vague and block-billed time entries and billing for clerical or administrative work); *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 64 (2d Cir. 2014) (upholding 50% across-the-board reduction where district court expressed concerns regarding "unspecified conferences, telephone calls, email correspondence, and reviews.").

Plaintiff submits contemporaneous billing records, which generally reflect for each attorney the hours expended, the work performed, and the billing rates applied. (*See* Billing Records). Defendants point to a number of "questionable task entries," including one 2.25 hour "conference with client" that would have taken place while Plaintiff was undergoing or recuperating from the surgery he received in connection with his injuries following the incident, and several other entries that they argue reveal that excessive hours spent drafting and filing documents in this case. (Def's Opp. to Fee App. ¶¶ 18–25). Though a conference immediately following Plaintiff's surgery is not inherently invalid, the Court agrees that the time spent drafting, and in particular filing, certain documents in this case appears to be excessive; namely, 2.6 hours drafting a 2.5-page stipulation, and 62.5 hours drafting a 22-page memorandum of law. (Billing Records at 7, 18–20).

The Court's independent assessment of counsel's billing records demonstrates other instances of vague entries (*see* Billing Records at 19 (.5 hours billed by Mr. Brewington to "review file and check status"); *id.* at 20 (.7 hours billed by Mr. Brewington to "review file in prep") *id.* at 25 (.6

hours billed by Mr. Brewington to "strategize on how to proceed"); instances of administrative or clerical work performed by senior attorneys (*see id.* at 20 (.4 hours billed by Mr. Brewington to "update case activity log"); and instances of block billing (*id.* at 28–37 (containing several block-billed entries attributed to Ms. John); (*id.* at 4, 9, 15 (containing block-billed entries attributed to Mr. Germano, billing substantive work and travel at the same rate), all of which counsel toward a downward adjustment. Mr. Masjid's entries, in particular, include vague references to combined conferences with clients, the NYPD, and NYC officials; block-billed entries that apparently combine various separate tasks into a once daily billed sum; and inexplicable references to a "50H" hearing, despite there being no colorable state law claims against public entities in this case. (*Id.* at 50–58). Further, the billing records provided and the amounts requested in Mr. Brewington's declaration contain a discrepancy accounting for nearly a thousand dollars. (*Compare* Billing Records at 47–48 (Timekeeper Summary) *with* Brewington Decl. ¶¶ 49–50). Specifically, Mr. Brewington removed 3.3 hours of time when outlining the amounts attributable to Mr. Germano for the Court, but did not subsequently remove the written off amount in calculating the total legal fees claimed. (*See* Brewington Decl. ¶ 49 (listing requested amounts that total $212,537.25 but ultimately requesting $213,362.25 in legal fees).

Based on these billing deficiencies, the Court concludes that a 15% across-the-board reduction of hours is appropriate. The applicable requested and adjusted rates, hours, and corresponding totals are therefore summarized below:

|  | Requested Hourly Rate | Adjusted Hourly Rate | Requested Hours | Adjusted Hours (15%) | Requested Total | Adjusted Total |
|---|---|---|---|---|---|---|
| **Brewington** | $500 | $450 | 139.10 | 118.24 | $69,550.00 | $53,208.00 |
| **Majid** | $375 | $300 | 92.00 | 78.20 | $34,500.00 | $23,460.00 |
| **Calliste** | $315 | $250 | 19.15 | 16.28 | $6,032.25 | $4,070.00 |
| **John** | $275 | $275 | 154.80 | 131.58 | $42,570.00 | $36,184.50 |
| **Germano** | $250 | $200 | 228.50 | 194.23 | $57,125.00 | $38,846.00 |
| **Lockett** | $150 | $100 | 18.40 | 15.64 | $2,760.00 | $1,564.00 |
|  |  |  |  |  | $212,537.25 | **$157,332.50** |

Accordingly, the Court calculates the lodestar figure to be $157,332.50, and awards Plaintiff that amount in attorneys' fees.

## C. Costs

"As for costs, a court will generally award 'those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" *Pennacchio v. Powers*, No. 05-CV-985 (RRM) (RML), 2011 WL 2945825, at *2 (E.D.N.Y. July 21, 2011) (quoting *LeBlanc-Sternberg*, 143 F.3d at 763). "Such reimbursable costs 'include filing fees, process servers, postage, travel, and photocopying,' as well as legal research costs." *Trs. of the Pavers & Rd. Builders Dist. Council Welfare v. M.C. Landscape Grp., Inc.*, No. 12 CIV 00834 (CBA) (VMS), 2016 WL 6998640, at *8 (E.D.N.Y. Aug. 25, 2016) (*quoting Capone v. Patchogue-Medford Union Free Sch. Dist.*, No. 0-CV-2947 (JS) (MLO), 2011 WL 743573, at *5 (E.D.N.Y. Feb. 23, 2011)), *adopted by* 2016 WL 7017336 (Nov. 30, 2016). "The fee applicant bears the burden of adequately documenting and itemizing the costs requested." *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, No. 10-CV-696 (KAM) (SMG), 2013 WL 950573, at *10 (E.D.N.Y. Mar. 12, 2013) (quoting *Pennacchio*, 2011 WL 2945825, at *2). Pursuant to Local Rule 54.1, the applicant "must include as part of the request 'an affidavit that the costs claimed are allowable by law, are correctly stated

74

and were necessarily incurred,'" and "[b]ills for the costs claimed must be attached as exhibits." *D.J. ex rel. Roberts v. City of New York*, No. 11 Civ. 5458 (JGK) (DF), 2012 WL 5431034, at *9 (S.D.N.Y. Oct. 16, 2012) (quoting Local Civ. R. 54.1(a)), *adopted by* 2012 WL 5429521 (Nov. 7, 2012).

Plaintiff requests "reimbursement of certain necessary costs and disbursements" in the amount of $11,728.80. (Brewington Decl. ¶ 51). Plaintiff submits the requisite affidavit and records reflecting costs incurred for filing and obtaining documents, postage, photocopying, legal research, translation, travel expenses, and expert witness costs that reflect that amount. (*See* Billing Records at 37–48). Defendants recommend a 40% cut to Plaintiff's twenty-five cents per page photocopying costs in particular, which they argue are excessive in comparison to the rates charged by their firm's vendor. (Def's Opp. to Fee App. ¶ 26). *See also BMG Music v. Pena*, No. 05-CV-2310 (RJD) (MDG), 2007 WL 2089367, at *8 (E.D.N.Y. July 19, 2007) (finding $740.50 requested copying costs excessive and recommending a fifty percent reduction ) *Norwest Fin., Inc. v. Fernandez*, 121 F. Supp. 2d 258, 263 (S.D.N.Y. 2000) (reducing twenty-five cents per page photocopying costs by fifty percent). However, the Court does not find twenty-five cents per page to be *per se* unreasonable, and finds that Plaintiff's counsel has provided adequate support for their request for expenses overall.

Accordingly, the Court awards Plaintiff the requested $11,728.80 in costs.

## CONCLUSION

For the reasons set forth above:

(1) The Moving Defendants' motions for judgment as a matter of law pursuant to Rule 50 are denied.

(2) The Moving Defendants' motions for a new trial pursuant to Rule 59 are granted with respect to liability and damages on Plaintiffs' common law negligence and assault and battery claims.

(3) The Moving Defendants' motion for a new trial pursuant to Rule 59 is denied with respect to liability and compensatory damages on Plaintiff's hostile work environment claims.

(4) The Moving Defendants' motion for a new trial pursuant to Rule 59 is granted with respect to punitive damages on Plaintiff's hostile work environment claims *if* Plaintiff refuses the remittitur amounts established above. That is, a new trial will be ordered unless Plaintiff agrees within thirty (30) days from the date of this Memorandum and Order, in writing, filed electronically with the Court and served on Defendants, to accept a remittitur of the punitive damages award to $475,000 as described above.

(5) The Court awards Plaintiff $157,332.50 in attorneys' fees and $11,728.80 in expenses.

**SO ORDERED**.

/s/ Ramon E. Reyes, Jr.
RAMON E. REYES, JR.
United States Magistrate Judge

Dated: September 6, 2022
Brooklyn, NY

76